## The People ex rel. The Detroit and Howell Railroad Co. v. The Township Board of Salem.

*Railroad aid by towns and counties: Taxation: For what purpose and by what rule.*

The exercise by a municipal corporation of the power to pledge its credit is an incipient step in the exercise of the power of taxation; and unless the object to be promoted be such as may be provided for by taxation, the power to make the pledge does not exist; and the Legislature cannot confer it.

It is essential to a valid exercise of the power of taxation that it be for a public purpose;—that it be exercised according to some rule of apportionment throughout the State,—if it be a State purpose; or throughout the municipal subdivision interested or to be affected, if it be local. The term "public purpose," as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow. It is, on the other hand, merely a term of classification, to distinguish objects for which according to settled usage the government is to provide, from those which, by the like usage are left to private inclination, interest or liberality.

A corporation created for the purpose of constructing a railway to be owned and operated by the corporators is a private corporation; and the road when constructed will not be a public highway, except in a very qualified sense, as it accommodates the travel and traffic of the public; and it is therefore no more a public object than any other private enterprise, which also supplies a public want or furnishes to the public a convenience.

Although an incidental benefit may accrue to the public from a private enterprise, yet that will afford no ground for imposing burdens upon the public by way of taxation in behalf of such enterprise.

The fact that the State may exercise the power of eminent domain in behalf of associated parties who propose to accommodate some public need, does not determine its right to exercise the power of taxation in behalf of the same parties, in aid of the same object. The principles governing the eminent domain, correspond to those controlling the police power, rather than to those applying to the power of taxation; and its exercise has regard rather to the public need than to the public character of its object. Every necessary industry has a right to exist, and if private interests would otherwise preclude, the eminent domain may be employed to give the opportunity; and on this ground a private corporation proposing to establish a thoroughfare may have compulsory means of obtaining a right of way. But taxation can no more be employed in behalf of such corporation than in behalf of the projectors of a mill, a hotel, or any other private enterprise.

*Heard April 7, 8, 12, 13, 14, 15, May 24, 25. Decided May 26.*

Application for *mandamus:*

By the Detroit and Howell Railroad Company to compel the Township Board of Salem, to execute and issue bonds to aid in the construction of the railroad proposed by the relator to be constructed through the township of Salem, as provided by act No. 49, of 1864, entitled "an act

THE PEOPLE *v.* SALEM.

to authorize the several townships in the counties of Livingston, Oakland, Washtenaw and Wayne, to pledge their credit, and the County of Livingston to raise by tax a loan of money to aid in the construction of a railroad from some point near the city of Detroit to Howell, in the County of Livingston."

An issue of fact, raised by the answer of the defendant, was directed by the Court to be tried in the Circuit Court for the County of Washtenaw, namely:—Whether the relator had completed its work through the township of Salem, to the extent required by the resolution of the township meeting, set forth in the relator's petition. This resolution provided that "no bonds, or other certificates of indebtedness shall be issued by said township to aid in the construction of the Detroit and Howell Railroad, unless the ties shall be furnished and delivered on the line of the road; and the road bed thereof, including all bridges, culverts, cattle-guards and road-crossings, shall be fully completed and ready for the iron, within the limits of the township of Salem, on or before the 1st day of July, A. D. 1868."

The issue was tried as directed, and the verdict of the jury was certified to this Court in favor of the relator.

*H. J. Beakes* and *G. V. N. Lothrop,* for defendants.

Townships have no power at common law, or under the general statutes of this State, to pledge their credit or make donations to private corporations or to individuals. They can exercise no powers except such as they enjoy by prescription, or are specially conferred upon them by statute.—*Lafayette v. Cox, 5 Ind., 38 ; People v. Supervisor of Blackman, 14 Mich., 336, 338 ; Cooper v. Alden, Harr. Ch., 86 ; Stetson v. Kempton, 13 Mass., 271, 278 ; Beatty v. Lessee of Knowles, 4 Peters, 152, 163 ; Sedgwick on Const. Law, 340, 341, 342, 346, 351 to 356 ; Pa. R. R. Co. v. Canal Commissioners, 21 Penn., 9 ; People v. Albany, 11*

*Wend.*, *544; 11 Pick. 396; 12 ib. 227; 19 ib. 485, 487; 1 Metcalf, 284, 287.*—A township cannot appropriate money to celebrate the 4th day of July.—*2 Denio, 110; Hood v. Lynn, 1 Allen, 103; New London v. Brainard, 22 Conn. 552.*—Nor to celebrate the surrender of Cornwallis.—*Tash v. Adams, 10 Cush., 252.*—Nor to vote money for the purchase of uniforms for an artillery company.—*Claflin v. Hopkinton, 4 Gray 502.*—Nor can a town be held liable on its corporate vote to pay the expenses of a field driver in defending a suit for taking up and impounding cattle running at large contrary to law.— *Vincent v. Nantucket, 12 Cushing, 105, 106.*—All the authorities which assert that towns may exercise the power in question seem to base the right entirely on special enabling statutes. —*Bridgeport v. H. R. R. Co., 15 Conn., 501; 49 Pa. State, 193; 19 Ill., 309; 36 Ala., 438; 2 Jones Eq., 144; 1 Sneed, 698.*

The Detroit and Howell Railroad Company is a private corporation.—*A. & A. on Corp. §§ 31, 32; 1 Red. on Railways, 53, 54, 3d ed; Dartmouth College v. Woodward, 4 Wheat. 468, 494; Whiting v. C. R. R. Co., Wisconsin Sup. Ct. Reported 1 Chicago Legal News, 378; State v. County of Wapello, 13 Iowa, 400-12; Hansen v. Vernon, Iowa Sup. Ct., April term, 1869, in Western Jurist, June 1869, 150; 21 Penn. St. 169, per Black, C. J.; 21 Penn. St. 182 per Woodward, J.*

The Constitution prohibits the legislation in question.

1. A construction of Sections 3, 6, 8, and 9, of Article XIV, which shall leave it in the power of the Legislature to authorize or compel each city and township in the state to grant or loan its credit to, or subscribe to the stock of, railroad companies or other corporations to the amount of a fixed and uniform percentage of the assessed valuation of property taxable therein, would render these sections nugatory.

State taxes are apportioned, in theory at least, among the cities and townships according to the amount of taxable property therein, and are collected by the city

and township officers. The argument for the power in question seems to require the maintenance of this proposition: that what the State as a whole cannot do, *it* may compel its constituent parts to do in the same proportion as would have fallen to their respective shares, if the State *eo nomine* had done it. In other words, if the power in question exists, *the State* by *its* Legislature may, under the guise of a township tax or loan, make precisely the same loans or donations to private corporations, and create precisely the same public burdens, and subject each tax payer in the state to precisely the same taxation as if there were no such limitations to legislative power.

The meaning of "works of internal improvement," as used in the Constitution, was railroads and canals, and enterprises of that character.—*Act 104 of 1839 ; Act 116 of 1839 ; Act 63 of 1840, &c. ;* See *State v. Wapello Co., 13 Iowa, 388,* and *People ex rel. McCagg v. Mayor &c., of Chicago, in Illinois Sup. Ct., Sept., 1869, reported 2 Chicago Legal News 2, 3, for construction of similar constitutional provisions in those states.*—If the *State* compels townships to issue their bonds for the construction of railroads, is it not "engaged in carrying on works of internal improvement?" The township of itself has no power to engage in any such work. What the township does in the matter it does under the authority and as an instrumentality of the State.—*18 Wend., 69, 70 ; C. &c., R. R. Co., v. Clinton Co., 1 Ohio State, 94, 95–6–7, 101; Cass v. Dillon, 2 Ohio State, 635–6, 641; 21 Pa., State, 181 ; Cooley Const. Lim., 211.*

2. It is to be borne in mind in the construction of those provisions of the Constitution that prior to 1850 the legislation, and it is believed the history, of the State afforded no precedent of township donation or pledges of credit or subscriptions for the construction of railroads or canals. It seems to have been assumed that the State *alone* of governmental organizations had power to aid those enterprises by pecuniary contributions. The State had been

engaged in works of internal improvement under which its credit had greatly suffered. Public sentiment had demanded and secured the sale or abandonment by the State of its railroads; and in 1850 it is believed the almost unanimous sentiment of the people was in favor of leaving the building and management of railroads wholly to private enterprise and speculation. The general financial prostration from which the people were just recovering, and the weight of public burdens made them dread a public debt; and it is but fair to suppose that the prohibitions in question repeated so industriously, were intended to cut up the supposed evil by the root, and make it impossible to create a public debt for internal improvements, as they were called. Municipal donations under State authority were within the mischief intended to be guarded against.—See *16 Mich.*, *258*.

3. Section I, Art. IV prohibits the creation of corporations by special act except for municipal purporses. The acts of February 5th, 1864, and of March 24th, 1869, are special acts. Can the Legislature by special act confer on townships already created, the power to raise money for other than municipal purposes, while it is prohibited from creating them with those powers originally?

4. The act of 1864 is not an exercise of "legislative power," and is, therefore, void, whether it comes within any of the express prohibitions of the conditions or not. It is not a *law*, but an attempted license to an act of spoliation. To compel A. to donate or loan his money to B. or to authorize a majority to compel the other citizens to donate or loan their property to private corporations or individuals, is not legislation. It is an imperial edict or *ukase*, inconsistent with the idea of a limited government,—and *a fortiori* inconsistent with the idea of legislative power in a government whose sovereignty is divided into independent departments, executive, legislative, and judicial.—§ *2 Art. 3.*

Private property cannot be taken for private use even with compensation without the owner's consent.— *Taylor v.*

*Porter, 4 Hill, 140 ; Powers v. Bergen, 2 Selden, 367 ; 39 Ill., 110, 114, 116 ; 53 Barb., 70 ; 1 Ohio St., 84–5 ; Wilkinson v. Leland, 2 Peters, 657 ; Hanson v. Vernon, 26 Iowa, 145 ; Bankhead v. Brown, 25 Iowa ; Sedgwick Const. Law, 155* and note; *Cooley Const. Lim., 530.*

The Legislature is the mere creature of the organic law, —deriving all its powers from the Constitution. The "legislative power" being granted to it, its authority within the limits of that power, may be admitted to be plenary except so far as otherwise specially limited; but outside those limits it is as powerless as if specially prohibited.—*1 Ohio St. 84–5; 21 Pa. St. 168–9 ; Cooley Const. Lim., 46, note 1.*

5. Of course the legislation in question cannot be sustained as an exercise of the right of *eminent domain.*—*Art. 18, § 14 ; Art. 15 § 15.*—Compensation where property is taken by right of eminent domain can only be made in money.—*Cooley Const. Lim., 556 ; People v. Brooklyn, 4 Comst., 419.*—Money or *choses in action* cannot be taken under this power.—*Cooley Const. Lim., 526–7,* and *note 1.*— It can be exercised only when *necessary,* not when merely convenient.—*Per Woodbury, J., in West River Bridge Co., v. Dix, 6 Howard 545, 546 ; Smith's Stat. and Const. Law, § 325 ; Cooley Const. Lim. 539.*—If sustainable at all, it must be under the taxing power.

6. Township taxation cannot be imposed except for township purposes.—*Ryerson v. Utley, 16 Mich., 276 ; Hammett v. Philadelphia, American Law Register for 1869, 411, 415, 422.* The relator's proposed road is not a local or township road. It extends from Detroit to Howell, at least, if not to Lansing. The proposed bonds are not to be used in the town of Salem alone, but anywhere on the line at the relator's discretion. The town of Salem is to have no rights of property in the road when built, and no voice in its management. Is the construction of such a road by *private* stockholders, by whom alone it is to be owned and controlled, a *township* purpose? *21 Pa. St. 182.*

7. If this legislation is for a local purpose, § 45, Art 4, of the Constitution required the assent of two-thirds of the members of each house of the legislature to the passage of the bill. No such assent was had.—*House Journal of 1864, 163; Senate Journal of 1864, 219.*

8. This legislation cannot be sustained under the taxing power. There is no power in the State to authorize a tax for private purposes. Taxes can only be levied for public purposes or to accomplish some government end.—*Cooley Const. Lim., 487, 211, 212; Hansen v. Vernon, 27 Iowa; 3 Western Jurist. 145; 21 Pa. St. 168; 22 Wis., 666–7; 31 Pa. St., 189; 39 Pa. St., 82; 21 Pa. St., 169.*

9. It does not seem necessary to discuss in this case the question whether it is competent for townships under legislative authority to subscribe for stock in a railroad running through the township. The only question here is whether a forced loan or donation to a railroad company can be sustained.

That it cannot, has been decided in Wisconsin under a constitution more like ours in matters material to this question than any other, (see *Art. VIII. Constitution of Wisconsin,* in *Wis. Rev. Stat. of 1849,*) in *Whiting v. Sheboygan R. R. Co., 1 Chicago Legal News, 378, 379,* June term, 1869; in New York in *Sweet v. Hulbert, 51 Barbour, 316,* and in Iowa in an opinion of remarkable ability in *Hanson v. Vernon,* April, 1869, *3 Western Jurist, 145.* See also *Curtis v. Whipple, Wisconsin Sup. Ct. 1 Chicago Legal News, 345, 346.* While there are a number of cases in other states sustaining the right to subscribe for stock, it is believed that no Supreme Court has yet decided that such a donation or loan can be enforced in view of the distinctions made in above cases.

10. The leading cases in support of municipal subscriptions for railroads (*Sharpless v. The Mayor of Philadelphia, 21 Penn. State Rep. 171,* decided by three Judges against two; and *Cincinnati, Wilmington and Zanesville R. R. Co.*

*v. Clinton Co., 1 Ohio State Rep. 77, 94, 95-6-7, 101,*) place their chief reliance on the ground that as the state might itself subscribe for railroad stock or build the railroad, it may do it indirectly through the agency of municipalities.—*Cessante ratione, cessat ipsa lex.—Bridgeport v. Housatonic R. R. Co., 15 Conn. 475, 500. Goddin v. Crump, 8 Leigh., 120,* was decided in 1837 by a divided court, under a constitution containing none of the restrictions cited from ours, and which expressly authorized the Legislature to delegate the power of taxation to local municipal governments for local municipal purposes. It was objected in that case that the work was so general that it could be aided only by the State, but the objection was not sustained, as according to *16 Mich., 276,* it should have been. *Nichol v. Mayor of Nashville, 9 Humphrey 252,* and the case in *1 Sneed, 637,* were decided under a constitution which expressly provided that "a well regulated system of internal improvements ought to be encouraged by the General Assembly," and gave the Legislature " the power to authorize the several counties and incorporated towns in this State to impose taxes for county and *corporation purposes* respectively, in such manner as shall be required by law," and admitted that if the purpose was not local the *mandamus* should be denied.—See *1 Sneed, 662, 664.*

The New York Constitution contains no such restriction as § *9 Art. 14,* of ours.—See *Clark v. Rochester, 24 Barb. 462* :—Reversing same cases in *13 Howard Prac. Rep., 304; 5 Am. Law Reg.,* ( old series ), *289.*

The Missouri Constitution provides in Art. 7 that "internal improvements shall forever be encouraged by the government of this State."—*R. S. Missouri of 1845, 40 ; Indiana Constitution,* see *1 R. S. Indiana, 64 ;* For Illinois Constitution, see § *38, art. 3, statutes of Illinois of 1856, 50 ;* See opinion *of Ranney, J., in Cass v. Dillon, 2 Ohio State Rep. 630, 636 ; State of Iowa v. Wapello County, 13 Iowa, 388, 410, 417, 418, 419 ; Clark v. Des Moines, 19 Iowa, 224; Mc-*

*Clure v. Owen*, *26 Iowa*; *13 Wis.*, *37*; *13 Wis.*, *414*, *418*; *Utley v. Ryerson*, *16 Mich.*, *267*, *274*, *275–6*; *Cooley's Const. Lim.*, *234*, *235*; *2 Redfield on Railways*, *397*, *398* and note.

It is submitted that, if it were necessary to argue the question of municipal subscriptions to railroad stock, there is no ground of principle and, (when constitutions are compared with ours), very little in the decisions in other States, to warrant such subscriptions in this State.

It is, however, one thing to say that as the town may build highways, it may therefore build and control and own, in whole or in part, railroads as an improved highway, but it is a very different thing to say that the town may, at the public expense, donate money to build private roads or private schools or hotels for the benefit of private owners and with no municipal control.

It is a remarkable fact that in most of the states where municipal subscriptions to railroad stock have been maintained by the courts, the revulsion of public sentiment has been so strong as to lead to prompt prohibitory constitutional amendments, as in Ohio, (see *Cass v. Dillon*, per Ranney, J., *2 Ohio St.*, *630*, *631*), and in Pennsylvania in 1857, and finally, in 1869, the correctness of the decision in the Sharpless case was questioned by the tribunal that rendered it, (*Hammett v. Philadelphia*, *8 Am. Law Reg.*, *411*, *418*), and in Indiana; and in every state in which such subscriptions have been allowed, wide-spread financial disaster and repudiation have followed.

*D. D. Hughes*, for relators.

The principal question involved in this case, and the only one we propose to discuss is:

The power of the Legislature of the State to authorize municipal corporations, counties, towns and cities, to aid railroad companies engaged in building roads to, through,

or near to such corporations; and, in that behalf, to create debts which must be met by taxation.

The question, though new to the courts of this State, is one which, as is well known, has been for many years the subject of extended, and at times excited discussion and consideration, in the courts of quite a number of our sister states, and now stands the cause of a serious conflict between the Supreme Court of the United States and that of the State of Iowa.

I. It is happily unnecessary in this Court to discuss the principle upon which alone an act of the Legislature of the State may, or ought, by it to be held unconstitutional and void. A series of its own decisions has settled that subject. The principle established is this: An act of the Legislature to be declared by the courts. unconstitutional, and for that reason ·void, must be prohibited by the express words of the Constitution, or by necessary implication. *Scott v. Smart's Executors, 1 Mich., 295 ; People v. Gallagher, 4 Mich., 244; Sears v. Cottrell, 5 Mich., 251 ; Tyler v. The People, 8 Mich., 320 ; People v. Blodgett, 13 Mich., 127 ; People v. Mahony, 13 Mich. 481.* In the language of Manning, J., in *Tyler v. The People,* " the Court should be able to lay its finger upon the part of the Constitution violated, and the infraction should be clear and free from doubt."

II. The question for discussion, then, is this:

Are acts of the Legislature of this State of the nature of those under consideration so clearly prohibited by any express words of the Constitution, or by necessary implication, that the Court can lay its finger on the part of the Constitution violated by this enactment ? Stated thus, we must confess that the question seems scarcely to admit of argument.

It will not, we think, be contended that such acts are prohibited by any *express words* of the Constitution. From what cause or causes arises the necessary implication ? The only provisions in our Constitution similar to the provisions

in the constitutions of other states which have been in-
voked against the validity of similar acts so far as we are
aware, are the following, to wit: Art. XIV, §§ 6, 8, 9; Art.
XV, § 13; Art. XVIII, § 14.

It would seem to demand a very strong and vivid im-
agination to discover the required "necessary implication"
in either of the three sections quoted from Art. XIV. Their
application is to "the State;" and the distinction between
the State as a corporate body and municipal corporations
within the state is, or at least, seems to us to be very clear
and broad, and this distinction is recognized over and over
again in the Constitution. But it may be contended, as it
has been, that the State cannot authorize its municipal cor-
porations to do what it has no authority to do itself.

This proposition may be plausible, but it is nevertheless
absurd, and its absurdity may be thus illustrated: 1. Sect.
3, of said Art. XIV of the Constitution provides, "The State
may contract debts to meet deficits in the revenue, *such
debts shall not in the aggregate at any one time exceed fifty
thousand dollars.*" Now, according to the proposition under
discussion, the State cannot authorize any, or indeed all of
its municipal corporations to contract debts, which shall at
any one time exceed fifty thousand dollars.

2. Said section 9, of Article XIV, must unquestionably
be so construed as to prohibit the State from constructing,
macadamizing, or paving roads or streets, or building brid-
ges. According to the principle under consideration, there-
fore, the State cannot authorize any of its municipal cor-
porations to construct, macadamize or pave a road, or build
a bridge.

Art. XV, § 13, 1. This section is by its terms, confined
in its application to cities and villages.

2. All the "aid laws" that have been passed by the Leg-
islature of the State, so far as we are aware, fix a limit to
the debts which may be contracted in that behalf, and this,

we submit, is a full and sufficient compliance with this section of the Constitution. *People v. Mahaney, 13 Mich., 481.*

3. This section expressly recognizes the power of cities and villages to loan their credit, and this is a strong argument in favor, rather than against, the constitutionality and validity of acts of the Legislature, of the nature of those under consideration.

4. Section 14, of Article XVIII, has no application. The acts under consideration confer no power to take property for public use, within the intent and meaning of this section of the Constitution. The power conferred is to assume pecuniary obligations, to contract debts, and to raise money to meet such obligations or debts by taxation.

It will be contended: 1. That the power of taxation can only be used to raise money for some public purpose, and that, therefore, the Legislature cannot authorize its municipal corporations to raise money by taxation, except for public purposes. 2. And that money paid to a private corporation to aid it to build a railroad, which it is to own and operate, when built, is not used for a public purpose.

The first of these propositions is unquestionably true. The second is fallacious and untrue.

Property taken for use in the building of a railroad by a private corporation, which it is to own and operate when built, is in a certain sense taken for the benefit of such corporation. It becomes its property, as long as it is used for the purpose of the road. Yet the authorities all agree, —there is not one dissenting voice,—that property thus taken by a private corporation is taken for public use, in a sense to authorize its seizure by proceedings *in invitum.*

The principle upon which these authorities rest is, that a railroad, although built by a private corporation, is a public improvement, and the property is taken primarily and directly to enhance such improvement. The benefit to the corporation is merely an indirect and collateral result. So, in the case of aid extended by municipalities, the pri-

mary and direct object is to advance the public improvement, not to benefit the corporation carrying it on.

Again ; the proposition under discussion, if sound, would prevent the State, independent of any constitutional inhibition, from extending aid to any private corporation engaged in a work of public improvement. Yet, so far as we are aware, the power of the State in that regard has never been questioned, and express constitutional inhibitions have been deemed necessary to prevent its abuse.

Another objection against such laws sometimes urged is, that they confer power upon municipal corporations outside and beyond the scope of the purposes for which they are created. This objection rests upon the same fallacy as the one last under consideration, and the answer to it is similar to the answer to that.

1. One of the leading powers which has always been vested in and exercised by municipal corporations, is the power to make, and to aid in making public improvements, such as the construction and repairing of streets, roads, bridges, and the like. And hence, if railroads are public improvements, to encourage and aid their construction would seem to be directly within the powers usually conferred upon municipal corporations.

This objection runs in the face of express provisions of the Constitution, to wit: Art. IV, § 38; Art. XI, §§ 1, 2; Art. XV, § 13.

These provisions of the Constitution seem clearly to give the Legislature authority to confer upon municipal corporations the power in question.

III. If decided cases are to have any effect, the constitutional authority of the Legislature to pass the acts under consideration, and similar acts, is established beyond controversy.

The question has been the subject of adjudication in the courts of *twenty States* of the Union; and, in all these States except two, the constitutionality of such acts is sus-

tained by an unbroken current of decisions, and by the earlier cases, in the two excepted States—Iowa and Wisconsin. *Stein v. Mayor, Aldermen, &c., of Mobile,* 24 *Ala.,* 591 ; *Wetumpka v. Winter,* 29 *Ala.,* 651 ; *Gibbon v. Mobile and G. N. Railroad Co.,* 36 *Ala.,* 410 ; *Bridgeport v. The Housatonic Railroad Co.,* 15 *Conn.,* 475 ; *Pattison v. Yuba,* 13 *Cal.,* 175 ; *Cotton v. Com. of Leon County,* 6 *Florida,* 610 ; *Winn v. Macon,* 21 *Georgia,* 675 ; *Towers v. Inferior Court of Dougherty County,* 23 *Georgia,* 275 ; *Prettyman v. Supervisors,* 19 *Ill.,* 406 ; *Robertson v. Rockford,* 21 *Ill.,* 451 ; *Johnson v. Stark,* 24 *Ill.,* 75 ; *Perkins v. Lewis,* 24 *Ill.,* 208 ; *Butler v. Dunham,* 27 *Ill.,* 474 ; *Aurora v. West,* 9 *Ind.,* 74 ; *Dubuque v. Railroad Co.,* 4 *Greene,* 1 ; *Clapp v. Cedar,* 5 *Iowa,* 15 ; *McMillan v. Boyle,* 6 *Iowa,* 304 ; *Ring v. Johnson,* 6 *Iowa,* 265 ; *McMillan v. County Judge,* 6 *Iowa,* 391 ; *Stokes v. Scott,* 10 *Iowa,* 166 ; *The State v. Wapello,* 13 *Iowa,* 388 ; *Talbot v. Dent,* 9 B. *Monroe,* 526 ; *The Justices, &c., v. Railroad Co.,* 11 B. *Monroe,* 143 ; *Slack v. Railroad Co.,* 13 B. *Monroe,* 1 ; *Maddox v. Graham,* 2 *Met., Ky.,* 56 ; *Police Jury v. Succession of John McDonough,* 8 *La., Ann.,* 341 ; *New Orleans v. Graihle,* 9 *La., Ann.,* 561 ; *Augusta Bank v. Augusta,* 49 *Me.,* 507 ; *St. Louis v. Alexander,* 23 *Mo.,* 483 ; *St. Joseph, &c., Railroad Co. v. Buchanan County Court,* 39 *Mo.,* 485 ; *Grant v. Courter,* 24 *Barb.,* 232 ; *Benson v. Mayor, &c.,* 24 *Barb.,* 248 ; *Clark v. Rochester,* 24 *Barb.,* 446 ; *Bank of Rome v. Rome,* 18 N. Y., 38 ; *Starin v. The Town of Genoa,* 23 N. Y., 439 ; *People v. Mitchell,* 45 *Barb.,* 208 ; *Taylor v. Com. of Newberne,* 2 *Jones Eq.,* 141 ; *Caldwell v. The Justices of Burke,* 4 *Jones Eq.,* 323 ; *Griffith v. Com. of Crawford County,* 20 *Ohio Appendix* 1 ; *Cincinnati, &c., R. R. Co. v. Com. of Clinton Co.,* 1 *Ohio State,* 77 ; *Cass v. Dillon,* 2 *Ohio State,* 607 ; *The State v. Trustees, &c.,* 8 *Ohio State,* 394 ; *Commonwealth v. McWilliams,* 11 *Penn.,* 61 ; *Sharpless v. Philadelphia,* 21 *Penn. State,* 147 ; *Commonwealth v. Com. of Alleghany Co.,* 32

THE PEOPLE v. SALEM.

*Penn., 218; The State v. Charleston, 10 Richardson, 491; R. R. Co. v. County Court of Davidson County, 1 Sneed, 637; Nichol v. Mayor, &c., 9 Humph., 252; Goddin v. Crump, 8 Leigh, 120; Clark v. Janesville, 10 Wis., 136; Bushnell v. Beloit, 10 Wis., 195.*

The Supreme Court of the United States not only recognizes and follows the doctrine established by these decisions of state courts, but expressly affirms its correctness. *Gelpicket v. City of Dubuque, 1 Wallace, 175; Thomson v. Lee County, 3 Wallace, 327; Rogers v. Burlington, 3 Wallace, 654.*

IV. Opposed to this overwhelming current of authorities stand:

1. The cases in Iowa since 1859, commencing with the case of *The State v. Wapello County, 13 Iowa, 388;* the ground of the decision in which is that the Legislature cannot authorize municipal corporations to *become stockholders* in private corporations, and ending with the recent case of *Hanson v. Vernon,* not yet reported, which holds that the Legislature cannot authorize municipal corporations to donate money to private corporations engaged in works of internal improvement, to aid such works.

2. The recent unreported case in Wisconsin of *Whiting v. The Sheboygan Railroad Company,* in which the Court draw a distinction between acts which authorize municipal corporations to subscribe for stock of private corporations engaged in works of internal improvement, such as the building of railroads; and acts which authorize *donations* of money by such municipalities in aid of such works, sustaining the former acts, but holding the latter unconstitutional.

3. The case of *Sweet v. Hulbert, 51 Barb., 316,* entirely similar to the Wisconsin case above mentioned.

4. An occasional dissenting opinion in cases which sustain the acts in question.

V. The distinction taken in the case of *Whiting v. The Sheboygan Railroad Company,* and *Sweet v. Hulbert,* are un-

founded. If the Legislature has power to confer upon municipal corporations authority to aid in building railroads, it is upon the ground that they are such public improvements as justify resort to the power of taxation to construct, and that the aid extended is to advance the improvement,—not to benefit the corporation engaged in making it. If this be so, it matters not in which form the aid is extended, whether by subscription to the stock of the corporation engaged in making the improvement, or a donation of money.

It may be possible that the many learned courts and judges arrayed on the one side of the question under discussion, may be all wrong, and the few on the other side right; but we submit that any court, however able and learned, should distrust the soundness of its reasoning, if it tends to such a conclusion.

*A. Pond*, on the same side.

I. In answer to the proposition, that acts of the nature of the one under consideration, are not legislative in their nature; and are, for that reason unconstitutional, although not in conflict with any express provision of the Constitution, I say:

1. That the power to raise money by taxation for the purposes of the government, and to appropriate such money, is legislative. This is not, and cannot be, disputed.

2. That the exercise of this power is not, and from the very nature of the case, cannot be controlled or limited by technical or definite rules, defining and designating the particular purposes for which money may be thus raised or appropriated. When raised, it is admitted that a very broad and uncontrolled discretion is vested in the Legislature.

3. That the power to raise money by taxation to be appropriated for other purposes than those connected either directly or indirectly with the carrying on of the machinery of the government and its various departments, has in all

governments, at all times, been recognized, admitted and acted upon without question or challenge.

4. That the power of governments themselves to engage in works of so-called internal improvement, and to raise money by taxation for that purpose, and for other purposes intended to develop the resources of the state, etc., etc., has always been claimed, admitted and acted upon.

5. That the power to raise money by taxation and appropriate and pay it over to individuals and corporations, and for purposes in no way connected with the carrying on of the government in its various departments, has always, in all governments, been admitted and exercised. Money has been thus raised and appropriated :—1 To aid in building meeting houses and to support churches and religious societies. 2. To aid in the support of charitable and benevolent societies. 3. To aid in the support of schools and colleges established and carried on by individuals and corporations directly for their own private profit. 4. To aid in the support of agricultural and like societies. 5. To reward inventors and other supposed public benefactors. 6. As bounties to induce individuals and corporations to engage in some business supposed to be calculated to develop the resources of the State. 7. To corporations engaged in carrying on works of so-called internal improvement, such as constructing improved wagon roads, railroads, canals, bridges, etc., etc. 8. That to retain and limit this power, express provisions have been deemed necessary, and have been inserted in constitutions, such as in our Constitution: Art. IV, §§ 39, 40, 45; Art. XIV, §§ 6, 8, 9; Art. XV, § 13. And I submit that it is under these circumstances, too late now to question the existence of such power.

II. If the purpose for which the Legislature undertake to levy money by taxation, or to appropriate money, is in the least degree of a public nature, or bears any relation to the public prosperity, interest or good, whether such degree is sufficient to justify the taxation or appropriation is solely

for the Legislature. The courts cannot review; so are the authorities, and they are founded in reason. A court might, with equal propriety, undertake to say that a legislature had made a larger appropriation than the degree of public interest warranted, in a case in which the right to make some appropriation was conceded, as to pass upon the *degree* of public interest *necessary* to justify any appropriation.

Subsequently,—on the 24th and 25th of May, the cause was re-argued by the same counsel, their attention having been specially directed by the Court to the following questions, as bearing upon the main question of the constitutionality of the law :

1. Did the proceedings which were had create a contract, or any relation or obligation in the nature of a contract, between the township and the railroad company? What was its precise character? If not, what is the specific ground upon which the company is entitled to the mandamus prayed for?

2. Could the Legislature, without the vote of the electors, compel the township to do what the act authorized it to do with reference to the issue of bonds and the levying of taxes to pay them? Or has the township any original or inherent power over the subject in question, except such as the Legislature has seen fit to allow them?

3. When the minority of the tax-payers of the township are compelled by a vote of the majority of the electors to pay the taxes in question, is it by any power existing in the township organization, or by the sovereign legislative power of the State?

4. Can the Legislature delegate to the township the power to determine for itself, as a local legislative or administrative body, by a majority of the electors, what enterprises of a public nature are so far of local benefit or advantage to the township as to justify township aid, enter-

ing into contracts to secure such benefit and to furnish such aid, and the imposition of taxes to meet the obligation thus incurred?

5. If bonds are issued by the township and given to the company to encourage the building of a road which, in the opinion of a majority, would not be otherwise constructed, and no arrangement is made binding the company to repay the bonds or money or any part of them, is this to be treated as a donation or as a consideration which the township is allowed to give for benefits which, in the opinion of the majority, will fully compensate them for the outlay?

6. Is there any proper rule of apportionment of the taxes provided for by the act, and what is that rule? Is the whole railroad, or only that portion of it within the township to be taken as the object for which the tax is raised?

7. Do sections 6, 8 and 9 of Article 14 of the Constitution prohibit the Legislature from granting to the townships the right to give aid to railroads as provided by the act? How does this prohibition differ in this respect from those in the Federal Constitution upon the States in respect to laws impairing the obligation of contracts; against entering into treaties; keeping troops and ships of war in time of peace, etc.; or from the prohibition, in our own Constitution, against the invasion of religious liberty?

8. What is the extent of the term "internal improvements" in section 9, Article 14 of our State Constitution?

COOLEY, J.

The act of 1864, under which the proceedings in question were taken, provides that it shall be lawful for each of the several townships in the counties of Livingston, Oakland, Washtenaw, and Wayne, to pledge their credit to aid in the construction of a railroad from some point near the city of Detroit to the village of Howell, for such sum or sums not exceeding five per centum of the assessed val-

nation for the time being, of the real and personal property in such township as the electors of such township shall, at a meeting or meetings called for that purpose, determine. The electors, it is also provided, may at such meeting or meetings, determine the terms, conditions, manner of executing the securities, and other particulars in regard to such pledge of credit, or they may empower some township officer or committee of electors to determine the same, and in case of no such determination or delegation of power to an officer or committee, then the several township boards of such townships are severally given power to determine all such particulars: *Provided,* That the amount of bonds that shall become due in any one year shall not exceed two per centum of the assessed valuation of such township at the time of issuing the same. The meeting of electors to decide upon such pledge is to be called by the Supervisor on a request signed by thirty tax-paying electors, and upon ten days' public notice, and the securities issued or made in pursuance of the act are declared to be a valid charge upon the taxable property of the township issuing or making the same, and it is made the duty of the township board to provide by tax for the payment of the principal and interest thereon, as fast as the same shall become due and payable by the terms thereof. But no bonds or other evidences of debt are to be delivered to the treasurer of any township, city or village for any railroad company, until all the terms and conditions required by the vote of the township, or by the proper authorities, shall have been complied with: *Provided,* That no bonds or other evidences of debt issued under the provisions of said act, or the moneys arising from the sale of the same, are to be delivered or paid over to the railroad company until the ties shall be furnished and delivered on the line of the road, and the roadbed thereof, including all bridges, culverts, cattle-guards, and road-crossings shall be fully completed and ready for the

iron, "within the limits of the municipalities rendering such aid."—*Laws of 1864, p. 96.*

The act also provides for aid by the county of Livingston in its corporate capacity, to the same line of road, and there are expressions in it which seem to imply an understanding on the part of the Legislature, that they had conferred the like power on the city of Detroit; but the power is not given in express terms, nor is machinery provided for its exercise. And, although "the several townships" in the counties named appear to be authorized to pledge their credit for the purpose specified, it would seem to be the intention of the Legislature to limit the right to such townships as might lie upon the line of any road which should be laid out and commenced, inasmuch as the securities or money are to be retained until certain progress has been made upon such road within the limits of the municipality rendering the aid.

Under this act it appears that the township of Salem voted aid to the extent of five per centum of its assessed valuation; but the meeting at which the vote was taken was irregular for want of sufficient notice, and a special act of the Legislature was obtained to legalize the same. A condition was attached to the vote, which the railroad company has complied with, but the township board refuse to issue the securities voted, claiming that the act of 1864 was in excess of legislative authority, and therefore unconstitutional and void, and that the township vote was in consequence a nullity. The railroad company therefore apply for a writ of *mandamus* to compel the delivery of the securities, and an issue of law having been joined upon their application, we are required to consider the important constitutional question which the objection of the township board presents.

I suppose if the legislative act in question can be sustained at all, it must be so sustained under the general authority of the State to prescribe and determine the ob-

jects to be provided for, fostered or aided through the expenditures of the public moneys. In other words, it must be regarded as an incipient step in the exercise of the sovereign power of taxation. This power, we are told, is not, and from its very nature cannot, be controlled and limited by precise and accurate rules, which shall designate and define in all cases the particular purposes for which alone moneys shall be raised, or to which they may be appropriated when raised, or the extent of the burden which may be imposed, and it is added that upon all these points a broad and uncontrollable discretion is necessarily vested in the legislative department of every government.

It is conceded, nevertheless, that there are certain limitations upon this power, not prescribed in express terms by any constitutional provision, but inherent in the subject itself, which attend its exercise under all circumstances, and which are as inflexible and absolute in their restraints as if directly imposed in the most positive form of words. It is not doubted by any one, that the power of the Legislature to determine for what purposes taxes shall be levied, and what districts of territory and what classes of persons and property shall bear the burden is very broad, and it must be confessed that in describing or defining it words are sometimes employed by the courts which import an absolute and unlimited discretion, such as might exist in an irresponsible government, or in the people, if acting in their sovereign capacity, without any written constitution, and which consequently could not be brought to the test of any restrictive rules. For many purposes these broad and loose definitions of the power of taxation are not objectionable, but they cannot be regarded as careful and precise enough to be tests of constitutional authority, and whenever they are employed in the law, the modifications by familiar constitutional principles are always to be understood.

I understand that, in order to render valid a burden

20 MICH.—H³.

imposed by the Legislature under an exercise of the power of taxation, the following requisites must appear:

1.  It must be imposed for a public, and not for a mere private purpose. Taxation is a mode of raising revenue for public purposes only, and, as is said in some of the cases, when it is prostituted to objects in no way connected with the public interest or welfare, it ceases to be taxation and becomes plunder.—*Sharpless v. Mayor, etc., 21 Penn. St., 168; Grim v. Weissenberg School District, 57 Penn. St., 433; Broadhead v. Milwaukee, 19 Wis., 652.*

2.  The tax must be laid according to some rule of apportionment; not arbitrarily or by caprice, but so that the burden may be made to fall with something like impartiality upon the persons or property upon which it justly and equitably should rest. A state burden is not to be imposed upon any territory smaller than the whole state, nor a county burden upon any territory smaller or greater than the county. Equality in the imposition of the burden is of the very essence of the power itself, and though absolute equality and absolute justice are never attainable, the adoption of some rule tending to that end is indispensable. *Weeks v. Milwaukee, 10 Wis., 258; Ryerson v. Utley, 16 Mich., 269; Merrick v. Amherst, 12 Allen, 504.*

3.  As a corollary from the preceeding, if the tax is imposed upon one of the municipal subdivisions of the state only, the purpose must not only be a public purpose, as regards the people of that subdivision, but it must also be local, that is to say, the people of that municipality must have a special and peculiar interest in the object to be accomplished, which will make it just, proper and equitable that they should bear the burden, rather than the state at large, or any more considerable portion of the state.—*Wells v. Weston, 22 Mo., 384; Covington v. Southgate, 15 B. Mon., 491; Morford v. Unger, 8 Iowa, 82.*

The three principles here stated are fundamental maxims in the law of taxation. They inhere as conditions in

the power to impose any taxes whatsoever, or to create any burden for which taxation is to provide; and it is only when they are observed that the legislative department is exercising an authority over this subject which it has received from the people, and only then is that supreme legislative discretion of which the authorities speak called into action. No discretionary power in that department is so absolute, and no judgment it can pronounce is so conclusive, as to preclude the citizen's contesting it whenever he believes his rights have been invaded by a disregard of any of these conditions. The duty of considering such a question is both unwelcome and undesirable, but it is not a duty which can be avoided, and we have no disposition to postpone its performance.

I propose first to enquire whether the purpose to be accomplished by the act in question is a *public* purpose, in the sense implied when burdens are to be imposed under the legislative power over the subject of taxation.

I do not understand that the word *public*, when employed in reference to this power, is to be construed or applied in any narrow or illiberal sense, or in any sense which would preclude the Legislature from taking broad views of State interest, necessity or policy, or from giving those views effect by means of the public revenues. Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statemanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people. To erect the public buildings, to compensate the public officers and to discharge the public debts, are not the sole purposes to which the public revenues may be applied, but, on the contrary, considerations of natural equity, gratitude and charity are never out of place when the gen-

eral good of the whole people is in question, and may be kept in view in the imposition of the public burdens. The sovereign legislative authority must judge of the force of such considerations, on a general view of the just and proper demands upon the public treasury, and of the ability of the people to provide for all; and when that authority determines that such payments will subserve the public good, the responsibility of the legislator for the correctness of his judgment must be to the people whose representative he is, and upon whom the burdens he imposes must rest.

Nor has it ever been doubted that where the object of taxation was one of general interest to all parts of the state, it was competent for the State, instead of assuming the burden directly, and providing for it by means of a general state levy, to apportion it among the several counties and towns, and to authorize and require them to provide for it by local taxation. Our own State pursues this course invariably as regards its general burdens; in this respect following what I understand to be the general system of the country; and the result demonstrates that it is practicable, wise and expedient to make use of the local machinery as the best means of reaching all the people without confusion and without exciting discontent. There is not only nothing in this course inconsistent with correct principles, but on the contrary it is in most perfect accord with other features of our governmental polity; the general purpose being to leave with the local communities, in managing the public affairs which concern them, the largest possible liberty of action which is consistent with the general public order and good government.

In the present case it appears that the object of the burden is not to raise money for a purpose of general state interest. Its object, on the contrary, is to create a demand which shall be a burden upon a small portion of the state only. On the ground of local benefit a small district of the state is to be taxed to encourage

a local enterprise, which it is supposed will be of such peculiar local advantage that this district rather than the state at large, or any greater or smaller portion of the state, should contribute to its construction. The road, when constructed, is nevertheless to be exclusively private property, owned, controlled, and operated by a private corporation for the benefit of its own members, and to be subject to the supervision and control of the State only as other private property is, with such few exceptions as the State in granting the corporate powers has stipulated for in order to secure impartiality in the management of its business, and to prevent extortion. Primarily, therefore, the money, when raised, is to benefit a private corporation; to add to its funds and improve its property; and the benefit to the public is to be secondary and incidental, like that which springs from the building of a grist-mill, the establishment of a factory, the opening of a public inn, or from any other private enterprise which accommodates a local want and tends to increase local values.

A railroad, however, it is said is a public highway, and as such its construction is a public purpose, which may be accomplished through the instrumentality of the sovereign power of eminent domain even when individuals, and not the State, are to own and control it. This argument is supposed to possess great force, and it therefore becomes our duty to examine it with some care. It is true that a railroad in the hands of a private corporation is often spoken of as a public highway, and that it has been recognized as so far a public object as to justify the appropriation of private property for its construction; but this fact does not conclusively determine the right to employ taxation in aid of the road in the like case. Reasoning by analogy from one of the sovereign powers of government to another, is exceedingly liable to deceive and mislead. An object may be *public* in one sense and for one purpose, when in a general sense and for other purposes, it would be idle and

.misleading to apply the same term. All governmental powers exist for public purposes, but they are not necessarily to be exercised under the same conditions of public interest. The sovereign police power which the State possesses is to be exercised only for the general public welfare, but it reaches to every person, to every kind of business, to every species of property within the commonwealth. The conduct of every individual and the use of all property and of all rights is regulated by it, to any extent found necessary for the preservation of the public order, and also for the protection of the private rights of one individual against encroachments by others. The sovereign power of taxation is employed in a great many cases where the power of eminent domain might be made more immediately efficient and available, if constitutional principles would suffer it to be resorted to; but each of these powers has its own peculiar and appropriate sphere, and the object which is *public* for the demands of one is not necessarily of a character to permit the exercise of another.

I have said that railroads are often spoken of as a species of public highway. They are such in the sense that they accommodate the public travel, and that they are regulated by law with a view to preclude partiality in their accommodations. But their resemblance to the highways which belong to the public, which the people make and keep in repair, and which are open to the whole public to be used at will, and with such means of locomotion as taste, or pleasure, or convenience may dictate, is rather fanciful than otherwise, and has been made prominent, perhaps, rather from the necessity of resorting to the right of eminent domain for their establishment than for any other reason. They are not, when in private hands, the *people's highways;* but they are private property, whose owners make it their business to transport persons and merchandise in their own carriages, over their own land, for such pecuniary compensation as may be stipulated. These own-

ers carry on for their own benefit a business which has indeed its public aspect inasmuch as it accommodates a public want; and its establishment is consequently in a certain sense a public purpose.    But it is not such a purpose in any other or different sense than would be the opening of a hotel, the establishment of a line of stages, or the putting in operation of a grist-mill; each of which, may under proper circumstances be regarded as a local necessity, in which the local public may take an interest beyond what they would feel in other objects for which the right to impose taxation would be unquestionable.    The business of railroading in private hands is not to be distinguished in its legal characteristics from either of the other kinds of business here named, or from many others which might be mentioned; but in the case of *Weeks v. Milwaukee,* (*10 Wis., 242,*) the Supreme Court of Wisconsin justly treated with very little consideration the claim of a right to favor, under the power of taxation, -the construction of a public hotel, though the aid was to be rendered expressly " in view of the great public benefit which the construction of the hotel would be to the city."    The Court expressly declared that the public could not be compelled to aid such an enter- ' prise from any regard to the incidental benefits which the public were to receive therefrom.

The right of eminent domain is a vital right in every government, and must often be called into exercise when a special necessity demands that the private right in a particular piece of property shall give way for the public good. This right, it has been held, may be exercised on behalf of railways in the hands of private parties.    But there can be no doubt, I think, that this holding was a considerable modification of common law principles, though at the same time it must be admitted that it was on such strong grounds of necessity and policy, and in view of considerations so entirely new, as fully to excuse, and indeed to justify it. No principle was older, and none seemed better understood

or more inflexible, than that one man's property could not be taken under the power of the government and transferred to another against the will of the owner; but the State nevertheless is allowed to do so in the case of railroads, under the guise of a convenient fiction, which treats a corporation managing its own property for its own profit, as merely a public convenience and agency. Nothing but an overriding public necessity could ever have led the courts to this judgment, for when the relations between the proprietors of a railroad and the public are examined, we perceive at once that the idea of agency in a legal sense is inadmissible. They are public agents in the same sense that the proprietors of many other kinds of private business are, and not in any other or different sense. To illustrate this I might draw many exact parallels, but a single one will be sufficient for our purpose. The Michigan Central Railroad Company makes a business of transporting persons and property over its road for the profit of its stockholders, but at rates which the State has regulated, and on the condition which the State has prescribed, of furnishing impartial accommodations. It does so, moreover, under a charter from the State, from which it derives its authority; and for this charter it has rendered, or is supposed to have rendered, a compensation. The hackmen of Detroit make a business of transporting persons and property over shorter routes, for their own profit, and in like manner at rates which the law regulates, and on the like conditions of impartiality. To render the analogy closer, they are required to obtain a license from the public authorities to follow this calling, and for this license a fee is exacted. Like the railroad corporation they supply a public want, and if the former can be called a public agency, the latter, it must be conceded, are entitled to stand in the same category.

If we examine the subject critically, we shall find that the most important consideration in the case of eminent

domain is the necessity of accomplishing some public good which is otherwise impracticable, and we shall also find that the law does not so much regard the means as the need. The power is much nearer akin to that of the public police than to that of taxation; it goes but a step further, and that step is in the same direction. Every man has an abstract right to the exclusive use of his own property for his own enjoyment in such manner as he shall choose; but if he should choose to create a nuisance upon it, or to do anything which would preclude a reasonable enjoyment of adjacent property, the law would interfere to impose restraints. He is said to own his private lot to the center of the earth, but he would not be allowed to excavate it indefinitely, lest his neighbor's lot should disappear in the excavation. The abstract right to make use of his own property in his own way is compelled to yield to the general comfort and protection of community, and to a proper regard to relative rights in others. The situation of his property may even be such that he is compelled to dispose of it, because the law will not suffer his regular business to be carried on upon it. A needful and lawful species of manufacture may so injuriously affect the health and comfort of the vicinity that it cannot be tolerated in a densely settled neighborhood; and therefore the owner of a lot in that neighborhood will not be allowed to engage in that manufacture upon it, even though it be his regular and legitimate business. The butcher, in the vicinity of whose premises a village has grown up, finds himself compelled to remove his business elsewhere, because his right to make use of his lot as a place for the slaughter of cattle has become inconsistent with the superior right of community to the enjoyment of pure air and the accompanying blessings and comforts. The owner of a lot within the fire limits of a city may be compelled to part with the property because he is unable to erect a brick or stone structure

20 mion.—1³.

upon it, and the local regulations will not permit one of wood.

Eminent domain only recognizes and enforces the superior right of the community against the selfishness of individuals in a similar way. Every branch of needful industry has a right to exist, and community has a right to demand that it be permitted to exist, and if for that purpose a peculiar locality already in possession of an individual is essential, the owner's right to undisturbed occupancy must yield to the superior interest of the public. A railroad cannot go around the farm of every unwilling person, and the business of transporting persons and property for long distances by rail, which has been found so essential to the general enjoyment and welfare could never have existed if it were in the power of any unwilling person to stop the road at his boundary, or to demand unreasonable terms as a condition of passing him. The law interferes in these cases, and regulates the relative rights of the owner and of the community with as strict regard to justice and equity as the circumstances will permit. It does not deprive the owner of his property, but it compels him to dispose of so much of it as is essential on equitable terms. While, therefore, eminent domain establishes no industry, it so regulates the relative rights of all that no individual shall have it in his power to preclude its establishment.

It is proper, however, to add the remark, that even where the necessity is conceded, I do not understand that the right of eminent domain can be exercised on behalf of private parties or corporations, unless the State in permitting it reserves to itself a right to supervise and control the use by such regulations as shall ensure to the public the benefit promised thereby, and as shall preclude the purpose which the public had in view in authorizing the appropriation being defeated by partiality or unreasonably selfish action on the part of those who only on the ground of

public convenience and welfare have been suffered to make the appropriation.

In the case of *Sadler v. Langham, 34 Ala., 311,* it was held by the Supreme Court of Alabama, that the right of eminent domain might be exercised on behalf of mills which ground grain for toll, and were compelled by law to render impartial service for all, when it could not be for other mills; and the distinction made is a very reasonable one. Except that the necessity is wanting, there would be the same justification for the condemnation of lands for stables for the public draymen of a city, as for a way for a rail-road; the like power of regulating the use existing in each case, and the purpose in one being *public* in precisely the same sense as in the other.

But when we examine the power of taxation with a view to ascertain the purposes for which burdens may be imposed upon the public, we perceive at once that necessity is not the governing consideration, and that in many cases it has little or nothing to do with the question presented. Certain objects must of necessity be provided for under this power, but in regard to innumerable other objects for which the State imposes taxes upon its citizens, the question is always one of mere policy, and if the taxes are imposed, it is not because it is absolutely necessary that those objects should be accomplished, but because on the whole it is deemed best by the public authorities that they should be. On the other hand certain things of absolute necessity to civilized society the State is precluded, either by express constitutional provisions, or by necessary implication, from providing for at all; and they are left wholly to the fostering care of private enterprise and private liberality. We concede, for instance, that religion is essential, and that without it we should degenerate to barbarism and brutality; yet we prohibit the State from burdening the citizen with its support, and we content ourselves with recognizing and protecting its observance on secular grounds. Certain pro-

fessions and occupations in life are also essential, but we have no authority to employ the public moneys to induce persons to enter them. The necessity may be pressing, and to supply it may be in, a certain sense, to accomplish a "public purpose;" but it is not a purpose for which the power of taxation may be employed. The public necessity for an educated and skillful physician in some particular locality may be great and pressing, yet if the people should be taxed to hire one to locate there, the common voice would exclaim that the public moneys were being devoted to a *private* purpose. The opening of a new street in a city or village may be of trifling public importance as compared with the location within it of some new business or manufacture; but while the right to pay out the public funds for the one would be unquestionable, the other by common consent is classified as a private interest, which the public can aid as individuals if they see fit, while they are not permitted to employ the machinery of the government to that end. Indeed, the opening of a new street in the outskirts of a city is generally very much more a matter of private interest than of public concern; so much so that the owner of the land voluntarily throws it open to the public without compensation; yet even in a case where the public authorities did not regard the street as of sufficient importance to induce their taking the necessary action to secure it, it would not be doubted that the moment they should consent to accept it as a gift, the street would at once become a public object and purpose, upon which the public funds might be expended with no more restraints upon the action of the authorities in that particular, than if it were the most prominent and essential thoroughfare of the city.

By common consent also a large portion of the most urgent needs of society are relegated exclusively to the law of demand and supply. It is this in its natural operation, and without the interference of the government, that gives us the proper proportion of tillers of the soil, artisans, manu-

facturers, merchants and professional men, and that deter-mines when and where they shall give to society the benefit of their particular services.  However great the need in the direction of any particular calling, the interference of the government is not tolerated, because, though it might be supplying a public want, it is considered as invading the domain that belongs exclusively to private inclination and enterprise.  We perceive, therefore, that the term "public purpose," as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow.  It is, on the other hand, merely *a term of classifi-cation, to distinguish the objects for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private inclination, interest or liber-ality.*

It creates a broad and manifest distinction—one in regard to which there need be neither doubt nor difficulty—be-tween public works and private enterprises; between the public conveniences which it is the business of government to provide and those which private interest and competition will supply whenever the demand is sufficient.  When we draw this line of distinction, we perceive immediately that the present case falls outside of it.  It was at one time in this State deemed true policy that the government should supply railroad facilities to the traveling and commer-cial public, and while that policy prevailed, the right of taxation for the purpose was unquestionable.  Our policy in that respect has changed; railroads are no longer public works, but private property; individuals and not the State own and control them for their own profit; the public may reap many and large benefits from them, and indeed are expected to do so, but only incidentally, and only as they might reap similar benefits from other modes of investing private capital.  It is no longer recognized as proper or politic that the State should supply the means of locomotion

by rail to the people, and this species of work is therefore remitted to the care of private enterprise, and cannot be aided by the public funds, any more than can any other private undertaking which in like manner falls outside the line of distinction indicated.

In the course of the argument of this case allusion was made to the power of the State to pay bounties. But it is not in the power of the State, in my opinion, under the name of a bounty or under any other cover or subterfuge, to furnish the capital to set private parties up in any kind of business, or to subsidize their business after they have entered upon it. A bounty law of which this is the real nature is void, whatever may be the pretense on which it may be enacted. The right to hold out pecuniary inducements to the faithful performance of public duty in dangerous or responsible positions, stands upon a different footing altogether; nor have I any occasion to question the right to pay rewards for the destruction of wild beasts and other public pests ; a provision of this character being a mere police regulation. But the discrimination by the State between different classes of occupations, and the favoring of one at the expense of the rest, whether that one be farming or banking, merchandising or milling, printing or railroading, is not legitimate legislation, and is an invasion of that equality of right and privilege which is a maxim in State government. When the door is once opened to it, there is no line at which we can stop and say with confidence that thus far we may go with safety and propriety, but no further. Every honest employment is honorable; it is beneficial to the public; it deserves encouragement. The more sucessful we can make it, the more does it generally subserve the public good. But it is not the business of the State to make discriminations in favor of one class against another, or in favor of one employment against another. The State can have no favorites. Its business is to protect

the industry of all, and to give all the benefit of equal laws. It cannot compel an unwilling minority to submit to taxation in order that it may keep upon its feet any business that cannot stand alone. Moreover, it is not a weak interest only that can give plausible reasons for public aid : when the State once enters upon the business of subsidies, we shall not fail to discover that the strong and powerful interests are those most likely to control legislation, and that the weaker will be taxed to enhance the profits of the stronger. I shall not question the right of the people, by their Constitution, to open the door to such discriminations, but in this State they have not adopted that policy, and they have not authorized any department of the government to adopt it for them.

It scarcely seems necessary to say that what the State as a political community cannot do, it cannot require the inferior municipalities to do. When the case is found to stand entirely outside the domain of taxation, state burdens and township burdens are alike precluded ; no township vote and no township majority, however large, can affect the principle ; any single individual has a right to insist that the public do not own or control his property for the purpose of donations.

It may be proper to mention the maxim which is pressed upon our consideration, that the Legislature must pass upon the proper objects as well as the proper extent of taxation, not only in the case of the State at large, but in case also of the several municipal corporations. Those corporations certainly have no inherent power of taxation, but take only so much as the State shall see fit to allow, and under such restrictions as the Legislature may think proper to impose. I shall concede also that they are not left to their own option to exercise the power or to decline to exercise it ; for as regards alike the general purposes of the State and those of more local concern, they are to tax as they are bidden, and may be compelled to obey the legisla-

tive will. The power of coercion and control is nevertheless to be exercised in view of and in subordination to those maxims of local self-government which pervade our whole system, and which preclude arbitary and unaccustomed impositions, however desirable, in the opinion of the Legislature, the object to be attained may appear to be.

If the township of Salem can be required to tax itself in aid of the Detroit and Howell Railroad Company, it must be either *first*, on the ground of the incidental local benefit in the enhancement of values; or *second*, in considerration of the facilties which the road is to afford to the township for travel and business. The first ground is wholly inadmissible. The incidental benefit which any enterprise may bring to the public, has never been recognised as sufficient of itself to bring the object within the sphere of taxation. In the case of streets and similar public improvements, the benefits received by individuals have sometimes been accepted as a proper basis on which to apportion the burden; but in all such cases the power to tax is unquestionable, irrespective of the benefits. The question in such cases has not been of the right to tax, but of the proper basis of apportionment where the right was conceded.

The second ground is more plausible. To state the case in the form of a contract, it would stand thus: The township is to give or loan to the railroad company five per centum of its assessed valuation. In consideration whereof the railroad company agree to construct and operate their road, and to hold themselves ready at all times to give to the people of the township the facilities of travel and trade upon it, provided they will pay for such facilities the same rates which are to be charged to all other persons. In other words, the company agree, on being secured the sum mentioned, to take upon themselves the business of common carriers within the limits of the township.

If this consideration is sufficient in the case of common carriers, it must be sufficient also in the case of any other

employment. There is nothing in the business of carrying goods and passengers which gives the person who conducts it a claim upon the public different in its nature from that of the manufacturer or the merchant. Neither is it of the least importance in a legal point of view that the carrier is usually a corporation, while the other kinds of business named are more commonly carried on by single individuals or partnerships. These are accidental circumstances, which may or may not exist in any particular case. But if the Legislature should pass an act providing that the township of Salem should give or loan a certain percentage of its taxable property to any merchant who will undertake to erect a store within the township, and hold himself ready at all times to sell goods therein to the people of the township on terms as favorable as those he would exact from others, he would be a bold man who should undertake to defend such legislation on constitutional principles. Yet the case would possess all the elements of public interest which are to be found in the case before us; the public convenience would be subserved, and there would be a like tendency to increase local values. The difference in the cases would be in degree, and not in kind; and it would be easy to suggest enterprises as to which the comparison, even in degree, would not be to the advantage of the railroad. And when we have once determined that a municipal government can tax its citizens to make a donation to a railroad company, because of the incidental benefits expected from its operations, we do not go a single step further when we hold that it may use the public funds to erect a cotton or woolen factory, or a building suited to the manufacture of tobacco, and present it, on grounds of public benefit, to any person who will occupy it.

Such a case would not by any means be an extreme application of the principle contended for in the present proceeding. Newspapers are as much a public necessity as railroads. The city of Detroit contains several corporations

20 MICH.—J³.

which are carrying on the business of publishing such papers. Why should not the corporators, instead of furnishing from their own means the capital necessary to start themselves in business, have applied to the Legislature for an act authorizing the city to tax itself for that purpose? It is as difficult to make a success of a great newspaper as of a great railroad; the projectors do not more often make the business profitable to themselves; there are consequently all the same arguments to be advanced in favor of gratuities in their aid which are advanced here. We can go back to stage coaches as easily as we can dispense with the daily paper, which gives us the current news. It may be that, if this class of public benefactors were to be pensioned at the public expense, it would prove difficult for the Legislature to deal with the subject with entire impartiality; the political majority might regard those papers only as useful and deserving of encouragement which inculcated their own political views; but this would hardly be a question of law; and if they saw fit to allow those townships and cities which were disposed to do so, to vote aid to the party organs, the unwilling minority who did not believe in the benefits to be derived from such organs would be silenced by the decision we should render in favor of the present aid. The Legislature would have determined that the purpose was "public;" the need, in order to put an establishment upon a successful footing, would generally be very apparent and pressing; the benefits expected would be great, especially to the majority party, and we are not permitted to doubt that the local public, in very many cases, would sanction such legislation by voting the required aid. Newspapers are frequently started or aided by voluntary subscriptions when a concerted effort on the part of the subscribers would be very likely to induce the local majority to shoulder the voluntary burden upon the public. The farmer, the merchant, the manufacturer or the mechanic of the minority, who had been obliged when start-

ing his own business to furnish his own capital, might think it unjust that he was now obliged to render compulsory aid in supplying the capital for the business of others, but the complaint would be unimportant if the majority could be induced to acquiesce, and with the peculiar facilities which the favored interest possesses for the control of the public sentiment, we cannot doubt that it would be quite as successful as the "public good" would require in securing legislative action and favorable local votes.

I have stated the case on behalf of the railroad as strongly as is possible, for I have assumed that the road is certain to be constructed and to be operated afterwards, though the act in question makes no very effectual provision to that end, and the railroad company demand the bonds without expecting to give any security that the township will ever receive the expected benefit from its expenditure. The opposition to this proceeding may be based, for aught we know, upon a conviction that the enterprise cannot succeed, and that the money must consequently be wasted; but I prefer not to consider the case in any other light than that which is most favorable to the relator; and I shall therefore assume that the Legislature have established all possible safeguards against loss or disappointment, and that those safeguards would prove effectual. And regarding the case in that light it rests in my view upon fallacies which are transparent, and upon doctrines which, followed to their legitimate results, will leave us wholly at sea as regards the objects of taxation, and will justify a resort to that measure for almost any private purpose which can be suggested.

It is said, however, that there is an overwhelming weight of authority in support of this species of legislation. This statement is very often made with great emphasis, but without a foundation proportioned to the energy with which it is repeated. There is indeed a considerable number of cases which, for diverse and irreconcilable reasons, have supported

local taxation for objects of general interest, but many of these cases have not the least relevancy to the point here contested. Such cases for instance, as *Thomas v. Leland, (24 Wend., 65)*, and *Merrick v. Amherst, (12 Allen, 504)*, where local communities on the ground of special local benefit, have been allowed or compelled to tax themselves in aid of the public works or buildings owned by the State, are not at all analogous. Where the State itself is to receive the benefit of the taxation, in the increase of its public funds or the improvement of its public property, there can be no doubt of the public character of the purpose. Such of the other judicial decisions as are best reasoned rest plainly upon the doctrine that the State, having within itself unlimited authority to aid works of internal improvement, may use its municipal bodies as its agencies for that purpose,— a doctrine which is precluded by express provision in the Constitution of this State. If we set aside these two classes of cases, very little real authority remains to support the doctrine contended for. The right to vote municipal aid to railroads has been vigorously disputed from the beginning, and many eminent jurists have always denied it. I regard with the utmost respect the courts which have preceded us in considering this question, but we should be willfully blind if we shut our eyes to the fact that there have always been circumstances surrounding the consideration of this subject which have not been favorable to a complete and unbiased expression of views. It is easy to follow an apparent authority without stopping to question its soundness, when the popular desire is in the same direction ; and upon this subject there are repeated decisions which do not, by any new reasoning, or by any attempt to examine the subject on principle, add at all to the authority of those which preceded them. When cases follow in line for no better reason than because they have a case to follow, the authority is to be found in the first decision, and not by counting up the number in the line. The leading case upon the subject has

been the Pennsylvania case of *Sharpless v. Mayor*, etc. (*21 Penn. St., 147*), and we read the result in the language of the same Court in a subsequent case. "We know," say the Court, "the history of these municipal and county bonds; how the Legislature, yielding to popular excitement about railroads, authorized their issue; how grand jurors and county commissioners and city officers were moulded to the purposes of speculators; how recklessly railroad officers abused the over-wrought confidence of the public, and what burdens of debt and taxation have resulted to the people. A moneyed security was thrown upon the market by the paroxysm of the public mind." (*Diamond v. Lawrence County, 37 Penn. St., 353.*) The learned judges were quite too sanguine when they declared that the like could never happen again; but we are not concerned with their prophecy so much as we are with their manifest consciousness that these evils have come from a perversion of the law. The best judgment of the legal profession, so far as I have been able to judge, has always been against the lawfulness of this species of railroad aid, and there has been a steady and persistent protest which no popular clamor could silence, against the decisions which support it. This protest has of late been growing stronger instead of fainter, and if the recent decisions alone are regarded, the authority is clearly with the protest. But whether this is so or not is not of controlling authority here. We are embarrassed by no decisions in this State, and are at liberty, therefore, to consider this question on principle; and when the legal principle which should govern a case stands out in bold relief, it is manifestly more in accord with a proper discharge of judicial duty that we should reach to it with directness, than that we should shut our eyes to the principle and blindly follow where others have blindly led.

I have not deemed it important to consider any of the minor objections to this act; preferring as I do, to deal with the main and fundamental infirmity. The case before us is

that of a private corporation demanding a gratuity which has been voted to it in township meeting upon the assumption that its business operations and facilities will incidentally benefit the township. I do not find that the meeting possessed any inherent authority to pass such a vote, or that any such authority could have been conferred upon it. The Legislature could not confer upon the majority there convened a jurisdiction to measure for the minority the demands upon their gratitude or liberality. Individuals as such must make their own donations, and decide for themselves how far any proposed enterprise of other individuals, can properly and justly, in view of the benefits they may receive therefrom, demand their aid and assistance.

As, therefore, it appears that the first and most fundamental maxim of taxation is violated by the act in question, it becomes superfluous to consider whether the act would also violate the maxim of apportionment, or be obnoxious in its application, because the burden, even if public, could not also be regarded as local, and peculiar to this township. Equally superfluous is it to consider in detail the several express provisions of the State Constitution which the respondents suppose to be violated. If the authority exercised is not within the taxing power of the State, it is quite needless to discuss whether, if it were within it, there are not restrictions which prohibit its exercise.

The *mandamus* applied for should, in my opinion, be denied.

CAMPBELL, CH. J.

The questions presented in this case are brought within somewhat narrow bounds, as its decision depends on very plain principles. It is admitted by every one that the validity of the action of the towns in voting aid and levying taxes depends entirely on the power of the State to compel such action wherever it can permit it, and that no power

can be delegated to the towns in excess of what can be exercised without delegation by legislative. compulsion. The inquiry is reduced to the simple question whether taxes can be imposed at the pleasure of the Legislature against the people of local municipalities, to furnish aid to railroad companies in carrying out their enterprises.

It cannot be claimed that there is no limit to the power of taxation, which can prevent the imposition of taxes for all purposes which the Legislature may choose. There are purposes the illegality of which would be so manifest that, although not mentioned in any constitution, no one could hesitate to say the burden was not validly imposed to further them. The purposes for which taxes are imposed must be public purposes, and however close some things may be to the dividing line, yet whenever any subject lies clearly on one side or the other, the courts must sustain or reject the tax accordingly, whether the purpose be laudable or not.

It has been said to be too clear to need argument that it would be usurpation and not legislation to take the property of A and give it to B. It must be on the same ground equally illegal to tax A for the benefit of B ; for the amount of property taken against his will cannot make any difference in the principle, neither can it make the wrong any less that he has companions in misery. Taxation for private purposes is no more legal than robbery for private purposes. And where an enterprise is conducted by private persons for their own private benefit, the public authorities having no control over the expenditure, and no share in the profits, it is a private enterprise and not a public one, whether large or small, and whether profitable or unprofitable. No enterprise can be properly regarded as a public enterprise in which the public has no voice. For the expenditure of public money the Constitution and laws provide public officers and put them under adequate control and security. The money of the people belongs in the cus-

tody of the agents of the people. Governments cannot delegate public responsibilities to private and irresponsible hands.

Unless railroad companies can be regarded as in some way representing the public, then they cannot stand before the law on any other footing than private citizens. So far as their business is concerned, they furnish on a large scale, and in a more perfect way, the same benefits which are extended to the population by other carriers, by land or by water, and benefits quite similar in principle to those conferred by enterprising hotel-keepers, millers, and others who find it to their profit to entertain all applicants impartially. They benefit the municipal corporation or the State in their corporate capacities in no way whatever beyond paying their taxes, for which they are presumed in law to get a full equivalent. They benefit the neighborhood large or small in the same way that all other business and enterprise aid it, by increasing population and stimulating commerce and industry. They do on a large scale what every industrious settler does on a smaller scale, and they do it, just as every private person is supposed to conduct his affairs,—primarily for his own benefit, and incidentally for any advantages that may follow or attend their private success to the benefit of others. There is nothing in the nature of their business which distinguishes them from any other persons, so as to make it in any legal sense a public undertaking.

It is said, however, that by the exercise of the right of eminent domain they are affected with a public character, and become invested with public functions.

If the exercise of this power is never valid except on behalf of some public agency, then it might follow that it could not be used on behalf of these companies. It is reasoning in the wrong direction to determine the character of the beneficiary from the fact of its use. But it has been customary from time immemorial to allow lands to be taken for turnpikes and canals in the hands of private corpora-

tions, because the land could not otherwise, as a general thing, be obtained for the whole line. The fact that the work was one of general utility, and that no work of that description was possible without the exercise of this power, has created precedents which were readily applied to railroads. They were always founded on necessity, and were the extreme application of a power, which, in a much smaller degree, has frequently compelled private owners of property to submit to some obligations whereby their neighbors might be enabled the more securely and conveniently to use theirs. In some cities of England, by ancient custom, there were regulations concerning party walls, drains and the like, which rested on similar principles, and in some cases, modern legislation has followed the same road. The courts, when railroads were first invented, recognizing the necessity and endeavoring to find some plausible basis for it, carelessly said that the railroads must be regarded as agents of the State, and in this apparently simple way solved the difficulty. But it was a mere figure of speech, and made them no more State agents, than the decision that many things are lawful because devised by the government as necessary to carry out some governmental power makes every one who avails himself of the privileges of the law a government agent. Such a theory would make agents of pre-emptioners, and national bankers, and ocean captains, all of whom receive certain powers and privileges in order to further the policy of the United States, and some of whom have duties to perform as the conditions of their privileges, just as every citizen, in a smaller way, has certain duties laid upon him as a consideration for his legal rights. It might be difficult to trace out to any distinct and entirely satisfactory origin, in the theoretical system of human government, the propriety of allowing railroads to resort to compulsory means to obtain land for their tracks. But we perceive its necessity, and it has been provided by our Constitution, under which we hold all our tenures, that railroads may be organized.

20 MICH.—K³.

We are not required, therefore, to trouble ourselves in accounting for what we must accept as the law of the land. And we certainly are not required to explain an anomaly by resorting to a manifest fiction, which would lead to the most dangerous results.

When land is taken for railroad purposes it costs the State nothing, and the owner is supposed to obtain its value from the company. The taxable community, therefore, can never be injured or burdened by the process. The persons engaged in the enterprise pay themselves for their own property and privileges, and if the burden falls heavily on any one else, it is on the private citizen as land-owner and not as tax-payer. When the company, therefore, has completed its road, the public has lost nothing, and has incurred no responsibilities. Thenceforward the private corporation elects its own officers, appoints its own agents, makes its own regulations subject to the law, collects its own revenues, and, if the work pays, divides the profits among its stockholders. The public who travel are not a fixed or resident public, and must not be confounded with the political public represented by the authorities and controlling the taxation. The tax-paying community has no voice or interference in the management of the road, so long as the law is obeyed, any more than in any other private business. It is undertaken for private profit, and is in private and not public hands. The company and its officers are agents of no one but the stockholders, and such legal obligations and privileges as they possess are attached to their business as corresponding rights and duties attach under the law, and according to their nature, to all kinds of private callings.

Taxation in their behalf is as essentially taxation for private purposes as it would be for any person or business whatever. If the Legislature can raise money by taxation to be spent by them for their great enterprise, it can do the same thing to enable any private citizen to become a producer of values for his own emolument. All industry

helps general prosperity. No line can be found which can, in law, make one business more public than another. The power to resort to taxation to set men up in any business is a power that is foreign to the purposes of government. It is not legislative power, but unlimited sovereign will, that can compel one private citizen to furnish means to another. Taxation is only lawful to enable the government to fulfill its public duties, and to pay such expenses as are incident to public business. There is necessarily a considerable discretion to determine what means may be desirable to enable the government to do its work creditably, but a power to tax one citizen for the private emolument of another, upon any theory of mere incidental advantage to the general prosperity of large or small communities, can only rest on a foundation of absolute and irresponsible power to make favored classes and citizens, and make the whole body of tax-payers tributary to them. No such power can be tolerated in a republic, and no hint of such a power is to be found in our Constitution. As far as it speaks at all on the subject it prohibits State aid to private persons or enterprises, and if there is no specific prohibition of taxation for private purposes, it was on the same principle which left out prohibitions against giving private property away to private persons,—that is to say, the principle which renders it unnecessary to forbid powers which could not exist without clear and express grant.

For these reasons, and for those more fully expressed by my brother Cooley, I think no *mandamus* should issue.

CHRISTIANCY, J.

The magnitude of the interests involved in this case has made me cautious in reaching a conclusion; and though the case was very fully and ably argued on both sides at an early period in the term, and I was strongly inclined to the opinion that the act in question was unconstitutional, I still

had some doubts; and, with my views upon such questions, to doubt would be to uphold the law. I was desirous of hearing further argument, and the case has been reargued with such ability, thoroughness and research as is seldom equaled. Without expressing any opinion upon other questions discussed, my doubts upon the main question in the case have been resolved.

I concur fully in the opinion of my brother Cooley. And I concur also in that of the Chief Justice, so far as it relates to the power of the State, or any of its municipalities, to levy taxes for such merely incidental benefits as result from the building and operation of a railroad, or the prosecution of a private enterprise.

I am entirely satisfied such merely incidental public benefits cannot be made the basis of the right to raise taxes from the people, to be paid or loaned to a railroad corporation or other private parties for their own use, and without securing to the general or local public any greater interest in, benefit from, or control over the work or enterprise, than would have accrued from it, had the same been completed or carried on by the proprietors without such public aid.

My reasons for this conclusion have been so fully and ably presented by my brother Cooley as to render it unnecessary for me to repeat them, and I will add but a single consideration, which I think of some importance, and upon which he has not touched.

The theory upon which this and other acts granting aid to railroad corporations have been passed, and upon which they are sought to be maintained, is this: that, in this way, railroad accommodations may be secured in localities, where, but for such aid, the roads would not be constructed at all, or until a later period; that experience has demonstrated that railroads expedite the settlement and improvement of the country through which they run, adding largely to the value of real estate and promoting the prosperity of nearly all branches of business; that the aggregate of these inci-

dental benefits, if estimated in money, would sometimes equal, if not exceed, the benefits which the company or its stockholders derive from the work, when in successful operation ; in other words, that the stockholders reap but a part of the profit and advantage arising from the expenditure of their capital in the construction and operation of the road, while the public, or people along and near the line, receive the balance. It is therefore supposed to be but reasonable and equitable that the latter should contribute a part of the expense of the work, from which they derive such incidental benefits.

This theory at the first view seems plausible and just. A little reflection, however, and a recurrence to the fundamental principles upon which corporations are created by the State, will readily demonstrate that this theory is unsound upon any legal principle,—a mere legal fallacy, and no more just than sound. These incidental benefits which railroad corporations thus confer by the construction and operation of their roads, are the only consideration or compensation which they pay, or which the public receive for the large powers and exclusive privileges which the State has bestowed upon the corporators beyond those enjoyed by the citizens of the State generally, including the exercise of the sovereign power of eminent domain, and which, but for those incidental benefits, would be wholly unjustifiable and highly injurious to the people of the State. No one can fail, upon a little reflection, to see that these incidental benefits constitute the sole inducement and only possible justification to the government for the grant of such important and exclusive privileges. This is the fundamental legal idea upon which alone corporations are, or can be, created at all.

The corporation, therefore, in the reception and enjoyment of these large powers and privileges, upon all legal and constitutional principles, must be considered as having received a full equivalent and compensation for those same

incidental benefits which are now again urged as the basis of new and further compensation, as the foundation for the imposition of direct taxes for the increase of their funds; when they could never have had an existence as corporations but for the virtual promise and reasonable expectation that such benefits were to be enjoyed by the people without further compensation.

Such is one of the absurdities into which courts would be led, by elevating a mere incident into the place of its principal; a course of reasoning which, if applied to the Constitution, would furnish a ready method for avoiding any constitutional restriction.

GRAVES, J.

As I cannot concur in holding the statute in question, in this case, unconstitutional, I proceed to state some of the reasons which compel my dissent. But before coming to the main subject to be considered, it seems expedient to make some observations respecting the position of the Court upon questions of this character, and also to relieve the case as far as practicable from all irrelevant matter.

A statute of the State is upon trial, and it is not an isolated act which, in the haste and flurry of legislation has escaped scrutiny; but it belongs to a series of measures alike in principle and design, which have engaged the deliberate attention of several Legislatures and been debated for years in the press and before the people. The act before us neither owes its place upon the statute book to accident, inadvertence, or chicane. It is not the product of party machinery, or the fruit of petulant or hateful authority. Whatever its infirmities, it involves a principle which the people, by their representatives, have deliberately declared after ample discussion. So long as the measure was before the Legislature it challenged debate upon all the grounds of constitutionality, wisdom, and expediency, and it was the

duty of the Legislature, before adopting the measure, to be satisfied of its wisdom and justice as well as its constitutionality. In this tribunal, the door is closed to all debate except upon the single question of constitutional validity. As judges, we have no ears to hear, nor minds to consider, any argument which does not bear upon this legal point. We have no right to be influenced by any appeal, however forcible, based upon apprehensions, however reasonable, that momentous evils will be caused by the act if declared valid, or will follow its annulment if pronounced invalid. Neither can we listen to any argument drawn from the liability of the Legislature to abuse the power of taxation. The question is upon the *existence* of the power as applied to the particular subject, and not upon the degree to which it would be possible to carry it. All power is subject to abuse, and if this circumstance is to be taken as an argument against its existence, we are irresistibly driven to results fatal to the existence of all government. The same argument can be employed to beat down all original, as well as delegated authority. All human agencies are fallible, and the wisdom of man has never been able, and never will be able, to devise a system of government incapable of abuse. Every department may exceed its authority or pervert its power.

The judiciary has no pre-eminent claim to infallibility, and so long as judges are but men, they must continue to be subject to all the infirmities which waylay and beset the rest of mankind. We can find no sanctuary in any utopian theory from the ills and imperfections of human agency. According to the arrangement of our system, the principal safeguard against marked delinquencies must be found in the knowledge and rectitude of the people, and in official accountability. In this respect, the checks and correctives are quite as efficient in case of the Legislature, as in that of the judiciary.

It is, of course, admitted on all hands that no branch

of the government has the right to abdicate its duty, or arrogate to itself any function committed to another, or to exercise any authority which has been withheld or denied. The Legislature must make the law, the courts must construe and apply it, and the Executive enforce it. And when the constitutionality of an act is questioned, the case must be so decided by the courts as to recognize the supremacy of the Constitution. But there are some rules which govern in the investigation of constitutional questions which are too important to be overlooked. This matter is well explained by the majority of the Court in *Sears v. Cottrell, 5 Mich., 251.* The question then was, whether the act was constitutional which allowed the goods of a stranger, in the possession of a delinquent tax-payer, to be levied on for the tax. And the following passage, which received the assent of my brother Christiancy and Chief Justice Martin, is found in the opinion of Judge Manning: " If it be said, the law is unnecessarily severe, and may sometimes do injustice without fault in the sufferer under it, our reply is: These are considerations that may very properly be addressed to the Legislature, but not to the judiciary; they go to the expediency of the law, and not to its constitutionality: When courts of justice, by reason of such objections, however well founded, seek for some hidden or abstruse meaning in one or more clauses of the Constitution to annul a law, they encroach on the power of the Legislature, and make the Constitution, instead of construing it. They declare what the Constitution should be,—not what it is. The tendency of courts at the present day, we think, is too much in that direction. Hence, to some extent, the great number of constitutional questions that are constantly being brought before the courts for adjudication. The time was, and the period not very far distant, when courts were reluctant to declare a statute void, and did not feel warranted in doing it, unless they could lay their finger on the particular clause that was violated, and the conflict between the statute and Constitu-

tion *was obvious.* The judiciary is not above the laws and Constitution. Its province is to declare what the Constitution and laws are; giving a pre-eminence to the former, and declaring the latter void, only when repugnant to it. And while performing this duty, it should be recollected that its powers are as clearly limited by the Constitution and laws, as those of the executive and legislative departments of the government. When they exceed their powers, their acts may be declared void by the courts; but there is no power given to any department of the government to annul the acts of the judiciary, when it exceeds its powers; for which reason, if no other, it should always be careful to keep clearly within them."

In the same case, my brother Christiancy, after stating that the question was one of legislative power, and not of expediency, proceeded to contrast the principle, upon which the Federal and State governments were founded, in so far as material to exhibit the different courses to be pursued in investigating their powers, and held, as all the courts in the United States have held, and now hold, that in respect to questions of constitutional authority under the *former* the *inquiry* is, has the power in question been granted? and under the *latter*, has it been *prohibited?* Having made this entirely clear, he came to the conclusion that an act of the State Legislature not prohibited by the express words of the Constitution, or by necessary implication, could not be declared void as a violation of that instrument. He then stated the following proposition: " No rule of construction is better settled in this country, both upon principle and authority, than that the acts of a state legislature are *to be presumed constitutional* until the contrary is shown; and it is only when they *manifestly* infringe some provision of the Constitution that they can be declared void for that reason. In cases of *doubt,* every *possible presumption, not clearly inconsistent* with the language and the subject matter, is to be made in favor of the constitutionality of

the act." Numerous authorities are cited in support of this proposition, and many others could easily be added. The doctrine there stated is maintained by an overwhelming weight of authority in this country, and it has hitherto been considered as the law in this State. I do not understand that my brethren mean to depart from it.

But there is another passage in this opinion which I cannot forbear citing in this connection. It also bears upon the degree of evidence of unconstitutionality, which a court should require, before adjudging an act void on constitutional grounds. It is as follows: "No one who has alleged the unconstitutionality of this law has been willing to trust it to any *one* provision of the Constitution *alone*, but it is contended that, if not forbidden by one, it must be by an other. This attempt to base its unconstitutionality upon several distinct and separate provisions of the Constitution, in effect, concedes its constitutionality, as it necessarily implies a *reasonable doubt* whether it falls within any of the several prohibitions of the Constitution. To *doubt* which provision of that instrument is violated by it, is *to doubt* whether it is a violation of any, and if the case be not clear from a *reasonable doubt*, then, within the principles of all the authorities, the law must be sustained."

These views were reaffirmed by my brother Christiancy, in *Twitchell v. Blodgett, 13 Mich., 127,* and, in this last case, my brother Cooley declared that where a repugnancy is claimed to exist between an act of the Legislature and the Constitution, the courts must examine and construe the provisions of each in the light of the other. "*And they must sustain the law, if they have reasonable doubts of the conflict, even though the doubts spring from a construction of the Constitution itself.*" The language of Judge Manning, and of my brethren Christiancy and Cooley, expresses with force and clearness the idea almost universally entertained by jurists in this country, respecting the degree of evidence required to show an act unconstitutional, and there

is no occasion for citing cases in this and other States in its support.

The inquiry respects the validity of an act of a co-ordinate department of the government,—an act framed and passed by legislators and approved by a chief magistrate, sworn to obey the Constitution, and presumed to know and to regard their duties. In favor of the validity of an act so made, every reasonable presumption is due, and no court has the right to convict it of illegality, except upon evidence so clear and solid as to remove all reasonable doubt of its invalidity. My brethren are of opinion that the act allowing the township of Salem to aid in building the Detroit and Howell Road is palpably unconstitutional; that its invalidity is so clear and manifest, that no room for doubt on the subject remains. The *fatal objection in their minds is, that it attempts to authorize a tax on the people of the township for a mere private purpose*, and they first assume that this railroad corporation is a private one, and then argue that the power to aid it by municipal taxation is denied. In debating this question, they are compelled to prove that the exercise of the power of eminent domain, in favor of the corporation, does not admit any public quality in the corporation, or any relation between the corporation and the public which could, as a question of constitutional power, justify the exercise of the power of taxation to help build the road; and to maintain this position, an elaborate effort is made to prove the absurdity or incongruity of a contrary doctrine, by putting a great number of extreme cases, and cases assumed to be analogous. These supposed analogies are relied on with great confidence, and they furnish the principal argument, if not the only one, for the result which my brethren have reached. They deserve to be carefully noticed, in order to ascertain whether they are so constituted, as to make them answer the end they are supposed to establish. Now, in all the instances presented, in which it may be conceded that no tax could be levied to aid the

enterprise or business, however beneficial to the public, and however similar in character and incidents to the character and business of railroads, there is one fatal difficulty in the parallel. In none of the examples relied on, has the enterprise or business been stamped by authority of the State, with the public quality or character accorded to railroad corporations in this commonwealth.

Whatever direct or indirect advantages accrue to the public from any of the enterprises cited, to whatever extent any of them may at any time have been subject to local or State regulations, they have never been invested with that public character, which in this State has been impressed on and accorded to railroad corporations, and whether, upon principle, they were entitled to the same consideration and the same recognition, is of no consequence in this discussion, because we are not inquiring about what ought to have been, but about what is. We are not concerned to inquire whether the Legislature and the courts have been consistent in giving to railroad corporations a standing in their relations to the public, which has not been given to other corporations or enterprises resting on the same foundation and animated by the same principle. The point is whether the State has not by its Legislature and its courts given these corporations a *status* in their relations to the public, not possessed by the other bodies referred to.

We are often compelled to adopt this course, and however unreasonable to us, may appear the numberless discriminations which abound everywhere and have no support in principle, we are driven to accept the fact, and are not permitted to argue, that because a peculiar quality or privilege has not been bestowed upon some of a class of enterprises, alike in merit and in principle, it has therefore been denied to all. However closely, in many things, the business of hack companies, draying companies, printing companies, and the like may compare with the business of railroad corporations, and whatever the similitude between these

companies, the argument is not advanced, unless it appear that the comparison holds good in the particular quality or attribute upon which the controversy turns. A printing corporation is private. It operates beneficially for the public, and in these respects it agrees with the railroad corporation. But, until it is proved that the two corporations are alike private in all their relations and attributes, — until it appear that they are elementally the same in reference to that quality which in this State is said to determine the right to aid by taxation,—no admission of the invalidity of a tax to aid the printing company, can be urged against the existence of the power to raise money by tax to help build the railroad.

The exposition of my brethren, it appears to me, has not succeeded in showing that printing companies, hack companies, and the like, stand on the same footing in their relation to the public with railroad corporations; nor has it satisfactorily shown upon what grounds a railroad corporation is to be considered *public* in this State, in respect to the exercise of the power of eminent domain, and *private*, in respect to the exercise of the power of taxation.

Nobody, I believe, has ever supposed that printing companies and other similar bodies were so related to the public, as to justify the exercise of eminent domain in their favor. Certainly no such doctrine has ever been advanced in this State, and I suppose neither of my brethren would countenance it for a moment. From the time, however, of our territorial existence to the present hour, whatever our organic law, our legislatures and our courts have always considered that the power of eminent domain could be lawfully exercised in favor of railroad companies, and my brethren fully concede that the power may be so employed. There are difficulties in the opinions and views of my brethren on this subject, which, I think, have not been surmounted.

If, from the analogy between the relations and duties to the public of railroad corporations, and the relations and

duties to the public of printing, hack and dray companies, and the fact that no tax can be levied to aid or foster the latter, we ought to infer that no tax can be levied to aid in constructing the roads of the former, we may with equal propriety contend, either, that the right of eminent domain may be exercised *in favor* of the printing, hack and dray companies, contrary to all opinion, or that it cannot be exercised in favor of railroad corporations, which would be equally opposed to all opinion; and this would follow, because the argument actually rests upon the theory, that perfect equality exists between all these bodies in respect to the right to exercise any constitutional power in their favor, when the exercise of such right depends on their relations and duties to the public. All reasoning, therefore, against the power to aid the construction of a railroad by taxation, based upon the analogy between railroad corporations and other companies not entitled, will be likely to carry us to a result, as to the employment of the power of eminent domain, which all confess to be untenable.

In the observations which have been made, some topics have been alluded to which require more particular notice.

I do not contest the proposition that a tax must be imposed for a public and not a mere private use, and I admit that a corporation may be private in one sense and with reference to one power of government, while it is public in another sense, and with reference to another power of government. My brethren concede, that the relations of a railroad corporation to the public are such as to justify the exercise of the power of eminent domain in their favor, and this admission carries with it the further concession, that such corporations are public to that extent, and in that sense and relation, which will warrant the employment of that power in their favor under our Constitution. But having made this broad admission, they deny that these corporations are public to that extent, and in that sense and relation, which will allow local or general taxation to aid in

constructing their roads. The admission, however, is conclusive that railroad corporations are not wholly private in the strict technical sense, nor even in that sense in which printing companies, hack and dray companies and the like are private.

My brethren must, therefore, be understood as maintaining that railroad corporations hold a middle or anomalous position, and possess a mixed or double character, and they are therefore required to show, that in this state the kind of public character which will allow the exercise of the power of eminent domain is distinct and different from that which will allow the power of taxation to be exercised in the manner contemplated by the railroad aid acts, and that the railroad corporation possesses that kind which will justify the exercise of the former, and is wanting in that which will allow the employment of the latter. They are obliged to contend that the public quality of railroad corporations in this state, to which the exercise of the power of eminent domain is referrible, is by the law of this State, a public quality to which the exercise of the power of taxation as proposed cannot be referred. This has been attempted, but, with respect, I am compelled to say that the reasoning resorted to has failed to satisfy my mind. Unless some solid ground can be discovered, on which to rest the distinction we must conclude, either, that all our legislation and all our judgments in favor of allowing the power of eminent domain to be exercised in favor of railroad corporations have been illegal; and that the admission of my brethren in favor of the validity of such legislation, and such adjudications, is founded in error, or that the character accorded to these bodies, as a basis for allowing the employment of the power of eminent domain, is a character which will equally warrant the exercise of the power of taxation to aid in building the roads.

The exercise of the power of eminent domain is limited and restrained by our Constitution. Under it the property

of no one can be taken, except for *public use*, and it is admitted to be settled law that the *use* for a railroad corporation is a *public one* according to the Constitution. The Legislature and the courts have made no such distinction in favor of printing companies and the like. No court has decided that private property could be taken for their use, or that the taking of it for their use could by any possibility be justified, as a taking for public use within the meaning of the Constitution. As already stated, the Legislature and the courts have declared that the use of property for railroads is a public one, and that private property may be taken therefor, and in so doing they have, with the acquiescence of all the departments of the government and of the whole people, wrought into the very stamina of railroad corporations a quality of a public nature, not possessed by any other class of corporations called private; and this doctrine, although not unassailable or irreversible like a constitutional provision, is as much a part of the law of the State, while it continues, as a section of the Constitution itself.

The State not only recognizes these corporations as qualified to be aided by the power of eminent domain, but actually gives the aid and provides the official instruments deemed appropriate to work out the result. The companies are not merely incorporated and regulated. The State assists in getting the ground for the road. It provides that the machinery of the courts may be used therefor, and casts some portion of the expense in many, if not most cases, on the tax-payers. This is done, and confirmed as a proceeding under the Constitution. A court of justice can as well justify the exercise of the power of taxation, as the exercise of the power of eminent domain, upon grounds of extra constitutional necessity. But the fact is, that the exercise of neither can be so justified. Both powers spring from political organization and rest upon the fundamental law of such organization. We cannot conceive of the existence of

either power, independently of the organic arrangement which constitutes the corporate entity known as the Territory or State. My brethren do not propose to recede. They agree to stand upon the ground that it is settled, and wisely settled, that the power of eminent domain may be exercised in favor of railroad corporations, under a constitutional inhibition to take private property for any other than the *public use.* But has it not been long practically settled in this State, that under our laws the exercise of the power of eminent domain in favor of railroad corporations, can be justified only upon the ascription to them of the same public character or quality, or the same relation to the public, which my brethren hold to be necessary to justify the exercise of the taxing power to aid in the building of the roads, and which for this latter purpose are said to be wanting ?

In the case of *The People v. The Mayor of Brooklyn, 4 Comstock, 419,* Judge Ruggles, when considering the distinction between the taking of property under the power of eminent domain and under the taxing power, said: "Private property may be constitutionally taken for *public use in two modes ;* that is to say, by taxation and by right of eminent domain. These are rights which the people collectively retain over the property of individuals, to resume such portions as may be necessary for *public use.* The right of taxation and the right of eminent domain rest substantially on the same foundation." After having thus declared that both powers have substantially the same basis, and that under each the taking is for *public use,* he pointed out the vital and material distinction between them in these words : "Taxation exacts money, or services from individuals, as and for their respective shares of contribution to any public burthen. Private property taken for public use by right of eminent domain, is taken, not as the owner's share of contribution to a public burthen, but as so much beyond his share."

20 MICH.—M³.

This view has received the approbation of this Court both under its present and former organization, and the language quoted has been often cited and approved. It received the approval of a majority of this Court in *Sears v. Cottrell, 5 Mich.,* 251, and was quoted and expressly approved by my brother Campbell, in his dissenting opinion in that case; and the difference between the two powers, as here defined, was again referred to by my brother Campbell with approval in the *Woodbridge* case, *8 Mich.,* 274, 291, and also by my brother Christiancy in the same case at page 304.

It is true that neither Judge Ruggles, in the *People v. The Mayor of Brooklyn,* nor my brethren in the other cases, were contrasting the two powers for any purpose like the present. But it is evident that Judge Ruggles intended to mark the substantial difference, and the only substantial difference between these powers, and it appears equally plain to me that my brethren, in adopting the view of Judge Ruggles, accepted it as marking the sole fundamental distinction between them. An examination of the different opinions will, I conceive, make this quite clear. It will be noticed that no hint is given, that the power of eminent domain bears any relation to the police power, or that under a Constitution forbidding its exercise except to take property for *public use,* its employment to take property for a *private use,* or for the *private* use of a *private* corporation, could be justified on the *plea of necessity.* Nor is it suggested that the *private use* of a *private corporation* which *could not be aided by taxation,* could be so essential to the public interests, local or general, as to create a lawful necessity. But it was declared that the two powers rested substantially on the same foundation, and that under each the taking must be for public use, while the distinction, defined as the only material one, had no relation to any difference between one kind of public use and another. There is no intimation that the subject, which as a public

one, could call into exercise the power of eminent domain, would relapse into a private one, when the power of taxation should be invoked. And I am unable to discover any solid ground for admitting the right to take the property of the citizen against his consent, to make the road-bed of a railway corporation because the use is .public, and at the same time, for denying to a township, under a statute, the right to tax its citizens to help to build the road on the ground that the tax would be raised for a *private object*. The taking by eminent domain, positively and conclusively implies, that the property so taken is for public use, and when it is remembered that the exercise of this power, in favor of railroad corporations, was originally resisted upon the same ground upon which my brethren base their objection to municipal aid by taxation, namely,—that the corporations were private, and the property sought to be taken for a private and not a public use, the admission of the right to exercise the power of eminent domain in their favor presses with great force against the position now assumed, and when it is considered, that such exercise of the power has been vindicated and established by conceding to railroad corporations the very quality in question, it appears to me that the theory of my brethren becomes more than questionable.

In *Swan v. Williams, 2 Mich, 427* decided more than eighteen years ago, our predecessors had occasion to consider whether the Territorial Legislature had authority to authorize the appropriation of property for the use of the Pontiac Railroad Company. It was contended in that case that certain lands taken in the usual way for the company, were not taken for *public use*, because as was argued, they were taken for the private . profit and advantage of the company, without any provision in the charter to secure any right in the public to use the road, or to require it to be used for public benefit.

The opinion of the Court, delivered by Chief Justice Martin, appears to have been unanimous; and, as the right

to take the lands under the power of eminent domain, was maintained upon the ground of the peculiar relation which railroad companies bear to the public, I shall quote the most material part of the opinion bearing upon that point. The Court say: " The object of strictly private corporations is to aggregate the capital, the talents, and the skill of individuals, to foster industry and encourage the arts. Private advantage is the ultimate, as well as the immediate object of their creation, and such as results to the public is incidental, growing out of the general benefits acquired by the application of combined capital, skill, and talent to the pursuits of commerce and of trade and the necessities and conveniences of the community.

" But the object and the origin of that class of corporations represented by the defendants in this case, and *which might with far more propriety be styled public than private corporations,* are of an altogether different nature and character. Their very *existence* is based upon the delegation to them of the sovereign power to take private property for public use, and upon the continued exercise of that power in the use of the property for the purposes for which it was condemned. They are the means employed to carry into execution a given power. That private property can be taken by the government from one and bestowed upon another for private use, will not for a moment be contended, and *these corporations* can only be sustained upon the assumption that the powers delegated, are to a public agent, to work out a public use. To say, as has been too often carelessly said, that " the acts done by these corporations are done with a view to their own interests, from which an incidental benefit springs to the public," is to admit their private character, and the private use of the property condemned to their use. But it is obvious, that the object which determines the character of a corporation is that *designed* by the Legislature, rather than that *sought* by the company. If that object be primarily the private interest of its members, although an inci-

dental benefit may accrue to the government therefrom, then the corporation is private, but if that object be the public interest, to be secured by the exercise of powers, *delegated for that purpose*, which would otherwise repose in the State, then, although *private interest may* be incidentally promoted, the corporation is in its *nature public*. It is essentially the trustee of the government for the promotion of the objects desired,—a mere agent, to which authority is delegated to work out the public interest, through the means provided by government for that purpose, and broadly distinguishable from one created for the attainment of no public end, and from which no benefit accrues to the community except such as results incidentally, and not necessarily from its operation. In the creation of this class of corporations, *public duties* and *public interests are involved,* and the discharge of those duties and the attainment of those interests are the primary objects to be worked out through the powers delegated to them. To secure these, the right of pre-eminent sovereignty is exercised by the condemnation of lands to their use, *a right which can never be exercised for private purposes. How, then, can they be regarded as private associations, from the acts* of which *an incidental* benefit only springs to the public? It argues nothing that compensation is required to be made for property taken before it can be used, for this is made by the Constitution a condition to the exercise of this right by the government itself, and the delegation of the power necessarily carries the incident with it.

"Nor can it be said that the property, when taken, is not used by the public, but by the corporators, for their own profit and advantage. It is unquestionably true that these enterprises may be, and probably always are, undertaken with a view to private emolument on the part of the corporators, but it is none the less true that the object of the government in creating them is public utility, and that private benefit, instead of being the occasion of the grant,

is but the reward springing from the service. If this be not the correct view, then we confess we are unable to find any authority in the government to accomplish any work of public utility through any private medium or by delegated authority; yet all past history tells us that governments have more frequently effected these purposes through the aid of companies and corporations than by their immediate agents, and all experience tells us that this is the most wise and economical method of securing these improvements. The grant to the corporation is in no *essential* particular different from the employment of commissioners or agents. The difference is in degree rather than in principle, in compensation, rather than in power. The fact that the company receives the toll or compensation for the transportation of persons and property over the road is conceived to be a reason, and in fact the prominent reason, why these associations should be considered as private corporations: but the purpose designed by the government in the construction of these roads is the use of the public, the expeditious communication and transit from point to point and not revenue. It would not be contended for a moment that private property could be taken to be used for the latter purpose. The appropriation of the tolls, therefore, can be regarded only as compensation, and affords no basis upon which to construct an argument respecting the character of the company, or the validity of its charter.

"It is true, also, that the mode of conveyance and of travel is different upon this road, from that upon turnpikes and common highways, but this difference springs from the character and construction of the road, and the vehicles employed, and not in the use designed. The one is equally intended, however, to open good and easy communications, with the other; and so far as travel and the transportation of property is concerned, the public have the same rights in the one case as in the other, with this difference, that the means employed are varied with the mode of travel.

" The fact that upon railroads, individuals do not travel or transport property in their own vehicles, furnishes no argument in this particular, from the fact that the nature of the road, as well as the personal safety of individuals, renders it impossible that they should do so. If the right existed, it would not be exercised. Public security requires that the mode of travel and the means employed should be limited within, and subject to, the control of the company, and the Legislature would have but indifferently secured the public interest in extending the privilege to all."

I do not bind myself to all the *reasoning* embraced by this quotation, but I cite the passage to show precisely what our predecessors decided in 1852, and the grounds of that decision. For eighteen years this judgment has been accepted as decisive of the grounds upon which the power of eminent domain could be exercised in favor of railroad corporations in this commonwealth. But without assuming to overturn the judgment or to disturb it, my brethren now decide against the validity of municipal aid, on the exact ground that these corporations *do not possess* that specific character, in relation to the public, which our predecessors, in order to sustain, and as the sole ground, in their judgment, on which they could sustain the exercise of the power of eminent domain, *expressly and explicitly decided that they did possess.* Our predecessors emphatically placed their approval of the exercise of the one power exclusively upon reasons, which my brethren are obliged to repudiate in order to reach their conclusion that the other power cannot be exercised. If the Court was right in 1852, then the position now taken cannot be supported ; and on the other hand, if the substantial position, assumed by the Court in 1852, as a justification of the exercise of the power of eminent domain in favor of railroad corporations was fundamentally wrong, and was based upon reasons having no existence, then I am unable to discover in the able opinions of my learned brethren, or elsewhere, any satisfactory grounds

upon which private property can be taken for the use of those corporations against the will of the owner.

In view of all the circumstances, may it not be fairly contended that in this State at least, railroad corporations have, by legislative and judicial action, acquired a stamp which distinguishes them from the companies and enterprises mentioned by my brethren as private, and as producing many public benefits?

Have they not been recognized and held as possessing a *quasi* public character which entitled them to privileges, immunities and aids, and subjected them to regulations and conditions, not applicable to other organizations denominated private? These questions must be answered in the affirmative. Our legislative and judicial history require it; and, indeed, the course of legislation and of judicial action on this subject has not been singular.

It was hardly to be expected that legislatures and courts, when dealing with these new and anomalous creations, would adhere critically to the technical and refined distinctions, found in the books between corporations public and private, or attempt to fit these refractory bodies to impracticable definitions or classifications. It was very obvious to the common sense of legislatures and courts that railroad corporations must necessarily bear relations to the public, local and general, quite different from those borne by the corporations theretofore designated as private by text writers.

They were at once recognized as important auxiliaries to the business and social advancement of the countries they traversed, and as possessing an extraordinary capacity for usefulness to the government; they were seen to develop the resources of the community, increase the wealth of the people, and augment the public revenues. They were observed to furnish the means for cheap and rapid intercommunication; they were perceived to be efficient ministers of the public in peace and in war. In the carriage of the mails, in the transportation of commodities, and in the movement

of men and munitions of war, they were discovered to be agencies at once powerful and nearly indispensable. They were thought to possess no mean influence in binding the different sections of the country together, and it was believed to be quite impracticable to completely subject these organizations to the theories and distinctions which had sufficed for hack companies and kindred organizations.

My brethren are of opinion that the benefits and advantages which have been mentioned, and all others, general and local, which accrue to the public are merely incidental, and that taxation to aid a railroad corporation in building its road cannot be justified by the fact, that when built it will confer such benefits. Is the proposition as stated and applied perfectly clear and correct?

These corporations originate in two concurring but different interests: one private and the other public. The corporators represent the former and the public the latter. The direct purpose of the corporators is to make private gain, and as to them, the benefits and advantages received by the public, are incidental. The direct purpose of the public is to benefit and help the public, and whatever of private gain may accrue to the corporators is incidental as to the public. Whatever the public does is performed to advance the public interests only. The conferring of corporate life, the exercise of the power of eminent domain to procure a roadway and other needful things, and the raising of money by tax to help work the roadway into shape, are all acts which the public does exclusively for the public advantage. The private emolument of the corporators is not the object of the public, and the assumption that it is so, begs the question. Indeed, I am unable to see how the purpose of the corporators, however personal and private, can convert the public object into a private one. It is one of the usual and ordinary expedients of organized society, to work out the public good through the instrumentality of personal and private interests, and to make the cupidity

20 MICH.—N³.

and ambition of individuals the sources of advantage to the public, and I have never supposed that the end, on the side of the community, would be any the less public because the agency employed was influenced by private views.

It is unnecessary to enlarge on this topic, or to cite apposite examples. They are ever present. The State, in order to promote the public good, brings these corporations into existence. On the same ground, it aids in bringing the road itself into existence; and in keeping with the policy which dictates these things, it subjects the corporations to peculiar regulations, and clothes them with extraordinary immunities and privileges. Whether this is wise or not, is not the question. It is enough for us to know what is settled in this respect. I am led to conclude upon the best consideration I can bestow, that it has been settled, that these corporations are public, in the sense which will allow private property to be taken for their use; and I am unable to discover how we can refuse the aid of taxation on the ground that they are not public, in the sense to justify that. This opinion is longer, *much* longer, than I intended it should be; and I am as conscious as any one that it does not follow that much is proved, because much is said. The law requires me to state reasons for my dissent. I have written to justify myself,—not to convince others. I have this consolation, that if I am in error, my mistake can work no public mischief. My views carry with them no authority, and while I am unable to yield my assent to the doctrine announced by my brethren, I cheerfully bear my testimony to the thoroughness of their investigations, and the ability of their opinions.